829 F.2d 416
 8 Employee Benefits Ca 2475
 VORNADO, INC., t/a Two Guys
v.
TRUSTEES OF THE RETAIL STORE EMPLOYEES' UNION LOCAL 1262, et al.
v.
Benedict J. FOCARINO and Neal Rosen, et al.
VORNADO, INC., t/a Two Guys, et al.
v.
TRUSTEES OF THE RETAIL STORE EMPLOYEES' UNION LOCAL 1262, et al.
v.
Neal ROSEN, et al.
Appeal of VORNADO, INC., t/a Two Guys, ("Vornado"), Benedict
J. Focarino, Catherine Stillman and Linda Soto, Appellants.
 No. 86-5470.
 United States Court of Appeals,
Third Circuit.
 Argued June 25, 1987.
Decided Sept. 22, 1987.
 
 Brian D. Sullivan (argued), W. Thomas McDonough, Carl A. Schwarz, Jr., Montclair, N.J., for appellants.
 Ronald E. Richman (argued), Mark E. Brossman, Susan Jameson, Chadbourne & Parke, New York City, William Hunt, DeMaria Ellis & Hunt, Newark, N.J., for appellees.
 Peter H. Gould (argued), Washington, D.C., for amicus curiae, Pension Benefit Guar. Corp.
 Before GIBBONS, Chief Judge, WEIS, Circuit Judge, and POLLAK,* District Judge.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 Two questions are presented in this ERISA appeal. First, whether the Act gives a contributing employer the right to have a multiemployer pension fund transfer assets and liabilities pursuant to previously adopted rules. Second, whether, on partial termination of a pension plan, the trustees may use a method of valuation more conservative than current market rates to determine if non-vested participants' benefits have become non-forfeitable. The district court answered "no" to the first question and "yes" to the second. We agree and will affirm.
 
 
 2
 Plaintiff Vornado, Inc., formerly operated a chain of retail stores. Beginning in 1972, it entered into a series of collective bargaining agreements that included obligations to contribute, for the benefit of its store employees, to the multiemployer Retail Store Employees Union Local 1262 (Non-Food) Industry Pension Fund.
 
 
 3
 In November 1981, Vornado began to withdraw from the retail field. After closing its last store in February 1982, the company stopped making contributions to the fund. As a result of the termination of Vornado's retail business, many of its employees were discharged.
 
 
 4
 The fund had been qualified under ERISA; consequently, when Vornado ceased making payments it became subject to withdrawal liability. See 29 U.S.C. Sec. 1381. The trustees of the fund submitted a claim for $952,810 and later requested an additional $830,500.
 
 
 5
 Since the inception of the fund, about thirteen employers have contributed on behalf of their employees. Most, however, have made payments for only a few years and in much smaller amounts than Vornado, which accounted for approximately seventy-nine percent of total employer payments to the fund until 1980. That was the last full year that Vornado contributed before it began closing the stores. The eight smallest employers collectively accounted for slightly more than one percent.
 
 
 6
 Faced with the prospect of substantial withdrawal liability, Vornado cast about for alternative ways to meet its obligations to its former employees. After investigating the actuarial condition of the fund and mindful of the predominance of its former employees as beneficiaries, Vornado concluded that it would be desirable to transfer the assets and liabilities attributable to its employees to a single-employer plan.[1] The result would protect the interests of the Vornado beneficiaries but free the company from obligations to the multiemployer fund.
 
 
 7
 Discovering that the fund had not yet adopted rules governing the transfer of assets, as required by ERISA, 29 U.S.C. Sec. 1414(a), Vornado brought suit in the district court to compel the fund to do so. The district court concluded that the trustees had a duty to comply with this provision of the statute, and the fund responded by adopting rules in April 1984.
 
 
 8
 One of the adopted rules prohibited the transfer of ten percent or more of the fund's assets. Vornado's proposal would have required a transfer of substantially more than that amount; thus, the rules effectively frustrated Vornado's hopes to create a single-employer plan.
 
 
 9
 Vornado attacked the rules in the district court as unreasonable and violative of the statutory requirements. The district court rejected that argument, concluding that ERISA requires rules which apply only when a liability transfer occurs, and that the statute mandates no general rules governing transfer of both assets and liabilities. Vornado has appealed from that determination.
 
 
 10
 A separate consequence of Vornado's decision to close its doors was the partial termination of the fund within the meaning of the Internal Revenue Code. Section 1012(a), 26 U.S.C. Sec. 411(d)(3), requires a qualified plan to provide that the employees' rights to benefits are nonforfeitable "to the extent funded" on termination. The occurrence of a partial termination thus has significance for beneficiaries of the fund because it may result in nonforfeiture of their benefits.
 
 
 11
 A second suit was filed by Vornado and three of its employees--one of whom was a former fund trustee, another whose interest was vested because of completion of the ten years service required by the plan, and a third individual who had not been employed for the necessary ten years. Plaintiffs alleged that the trustees had failed to declare a formal partial termination in accordance with the Internal Revenue Code and that this inaction had both jeopardized Vornado's tax exemption and prejudiced the rights of non-vested employees.[2] This suit was consolidated with the one raising the asset transfer issue.
 
 
 12
 The district court found that the occurrence of a partial termination was not in dispute. The question, as the court saw it, was whether the partial termination was of any consequence to the beneficiaries and the employer. The interpretation given the "to the extent funded" clause in the Internal Revenue Code determined whether all employees had become vested, and that inquiry focused on the actuarial data used by the fund. The trustees assumed that future earnings on the fund's assets should be calculated at seven percent. Plaintiffs assert that this rate was unrealistically low and that the then current, higher market rate should have been employed.
 
 
 13
 The determination of a proper interest rate is significant because, applying the trustees' seven percent rate, the fund's liabilities would exceed its assets. In that event, the funds available would be inadequate to provide for participants other than those who were already vested. Participants with insufficient service could not gain non-forfeitable benefits. Plaintiffs argued that if the higher market rate were used, the assets would exceed liabilities, and the surplus could be allocated to newly-vesting employees. In making the calculations, plaintiffs also insisted that the amount of Vornado's withdrawal liability should be included as an asset of the fund.
 
 
 14
 The district court decided that the trustees had been justified in using the seven percent rate because it conformed with the Trust Plan. The Plan stated that in the event of a termination, assets should be used to satisfy liabilities "in the amount required in accordance with the actuarial assumptions underlying this Plan fully to fund the Retirement Pensions, based on the provisions of the Plan during the five year period prior to the date of the termination." An affidavit by the plan administrator averred that the Plan had used a seven percent rate for the calculation of lump sum amounts and for its minimum funding standard account.
 
 
 15
 Having determined that the fund had followed a permissible actuarial computation that resulted in a deficiency of assets to meet all liabilities, the court decided that the trustees' failure formally to declare a partial termination was of no consequence. Accordingly, summary judgment was entered for defendants.
 
 
 16
 Plaintiffs also complained that the trustees' actions had violated their fiduciary duties. The district court granted summary judgment on this claim, concluding that Vornado did not have standing to press it and that the other plaintiffs could not prove damages in view of the fund's fiscal condition. On appeal, plaintiffs have not argued that Vornado has standing, and our resolution of the other claims also disposes of this one.
 
 I.
 THE ASSET TRANSFER SUIT
 
 17
 Vornado concedes that ERISA does not give an employer an absolute right to require a transfer of assets, but contends that the statute does provide a mechanism through which an employer may propose a transfer and have its request judged by a standard that is not "unreasonably restrictive." Defendants, supported by amicus curiae, the Pension Benefit Guaranty Corporation, argue that ERISA does not require adoption of rules that permit an employer to obtain a transfer of assets and liabilities.
 
 
 18
 Section 4234(a) of ERISA provides in pertinent part:
 
 
 19
 "A transfer of assets from a multiemployer plan to another plan shall comply with asset-transfer rules which ...
 
 
 20
 (1) do not unreasonably restrict the transfer of plan assets in connection with the transfer of plan liabilities, and
 
 
 21
 (2) operate and are applied uniformly." (with exceptions not relevant here)
 
 
 22
 29 U.S.C. Sec. 1414(a).
 
 
 23
 The district court succinctly stated the parties' conflicting readings of the statute. Plaintiffs contended that "any asset transfer rules must be reasonable" or "to paraphrase the statute, cannot unreasonably restrict the transfer of assets and liabilities." Defendants, however, insisted that Sec. 1414 does not require the rules to permit the reasonable transfer of assets and liabilities, but only provides that "if liabilities are transferred, the rules cannot unreasonably restrict a concomitant transfer of assets."
 
 
 24
 The difference between the contentions of the two parties is subtle but significant. Vornado argues that the required rules should govern all transfers of assets and liabilities. The trustees' reading of the statute, however, focuses on the phrase "in connection with" and comes to the conclusion that, only after the trustees have independently decided to transfer liabilities, must they apply rules which do not "unreasonably restrict" the transfer of assets together with those liabilities.
 
 
 25
 To resort to a description overused but cherished by legal writers, "the statute is not a model of clarity." Although both sides can muster respectable argument, we are persuaded that the district court made the right choice.
 
 
 26
 The light of statutory purpose removes many of the shadows cast by otherwise ambiguous language. Title 29 U.S.C. Sec. 1414 is part of the Multiemployer Pension Plan Amendments Act, enacted by Congress in 1980 after the Pension Benefit Guaranty Corporation conducted a study of the difficulties faced by multiemployer plans. Withdrawals of contributors and transfers between funds had seriously affected the financial stability of these plans and had placed an increasing burden on the Pension Benefit Guaranty Corporation. Although the sparse legislative history of Sec. 1414 offers no help, the amendments as a whole clearly were meant to facilitate effective plan management and protect the interests of beneficiaries and participants.
 
 
 27
 Some significance lies in the fact that the statute refers to "asset transfer rules," and not to "asset and liability transfer rules." The statutory phrase "in connection with" may not be overlooked either. See Bell v. United States, 754 F.2d 490, 498-99 (3d Cir.1985); 2A Sutherland's Statutory Construction Sec. 46.06 (4th ed. 1984). (Every word should be given effect). Under Vornado's reading, "in connection with" becomes meaningless, adding nothing to the statute.
 
 
 28
 Other provisions of these same amendments show that Congress specified "assets and liabilities" in the conjunctive when that was its intent. For example, 29 U.S.C. Sec. 1415, governing the transfer of one plan to another because of a change in collective bargaining representation, provides that the "old plan shall transfer assets and liabilities to the new plan."
 
 
 29
 Similarly, 29 U.S.C. Sec. 1412(c)(3) provides that in the case of certain transfers of liabilities from a multiemployer to a single-employer plan, the multiemployer plan shall not be liable to the Pension Benefit Guaranty Corporation if the assets also transferred were at a specified level. Section 1412 contains requirements designed to safeguard the interests of the beneficiaries, participants, and the contingent interest of the Pension Benefit Guaranty Corporation in the solvency of the plans. Thus, the structure of subsection (c)(3) is similar to the construction the district court gave to Sec. 1414.[3]
 
 
 30
 The 1980 amendments provided that under Sec. 1411 a plan sponsor (the trustees) may cause a multiemployer plan to merge with another only if it complies with regulations of the Pension Benefit Guaranty Corporation, the benefits of participants are not adversely affected, and other statutory conditions are observed. Significantly, none of these sections evidences any inclination to require transfers at the instance of employers. A transfer is mandatory only when the collective bargaining representation has changed--an action taken by employees, not the employer. The provisions controlling transfers demonstrate congressional concern that plan insolvency may adversely affect the beneficiaries or employees, or require payments of benefits by the Pension Benefit Guaranty Corporation.
 
 
 31
 The plaintiffs' interpretation of Sec. 1414, however, would have the ultimate effect of requiring trustees to permit the transfer of liabilities and assets at the request of an employer when the circumstances came within the "reasonable rules promulgated by the trustees." Thus, the trustees' discretion would be narrowed by rules which, although seemingly satisfactory at the time of enactment, might prove disadvantageous to the fund in particular circumstances. That undeniable shift in initiative from trustee to employer is inconsistent with the thrust of the 1980 amendments; they emphasize the interests of the beneficiaries and the Pension Benefit Guaranty Corporation, and lack any suggestion that Congress intended to increase the power of contributing employers.
 
 
 32
 The district judge's ruling leaves the possibility of a transfer of liabilities, with a concomitant transfer of assets, to the discretion of the trustees, acting in accordance with their fiduciary obligations and the statutory requirements. We believe this result comports with the congressional intent behind the 1980 amendments.
 
 
 33
 We are not persuaded by the plaintiffs' contention that this interpretation gives the trustees "total discretion" because they could refuse any liability transfer and thus avoid all asset transfers. The trustees must reach all decisions guided by their fiduciary responsibilities; they must consider the welfare of the fund and the beneficiaries and are not free to reject all proposed transfers.
 
 
 34
 In reaching his conclusion, the district judge felt that he owed "great deference" to the interpretation advanced by the Pension Benefit Guaranty Corporation, which presented its views as amicus curiae. We have reached our conclusion, however, on the basis of our independent judgment, exercising a plenary review of the purely legal questions presented. The Pension Benefit Guaranty Corporation's views have been helpful and informative, but we do not "defer" to its opinion in the sense that the result we reach is anything other than our own view of the proper interpretation of the statute. We acknowledge our duty to interpret statutory provisions and do not yield that responsibility to an entity outside the judicial branch. See Pension Benefit Guaranty Corp. v. Heppenstall Co., 633 F.2d 293 (3d Cir.1980); cf. United Steelworkers v. Harris & Sons Steel Co., 706 F.2d 1289 (3d Cir.1983).
 
 II.
 THE PARTIAL TERMINATION SUIT
 
 35
 The Internal Revenue Code provides that to qualify for favorable tax treatment, a pension fund or trust must specify "that upon its termination or partial termination ... the rights of all affected employees to benefits accrued to the date of such termination, partial termination, or discontinuance, to the extent funded as of such date, or the amounts credited to the employees' accounts, are nonforfeitable." 26 U.S.C. Sec. 411(d)(3).
 
 
 36
 Whether a partial termination of a qualified pension trust has occurred must be decided in view of all relevant facts and circumstances. Weil v. Retirement Plan Admin. Committee, 750 F.2d 10 (2d Cir.1984). This area is one of the unsettled facets in the law; however, in this case, the occurrence of a partial termination is not at issue. Defendants have not cross-appealed from that aspect of the district court's conclusion. The parties agree that the question here is whether the partial termination had any relevant consequences. Cf. Bruch v. Firestone Tire & Rubber Co., 828 F.2d (3d Cir. 1987) (Count alleging partial termination withdrawn from suit).
 
 
 37
 The plaintiffs' position is that in the event of a partial termination, the trustees need not actually terminate the fund, nor must they purchase annuities or establish a dedicated bond portfolio. These devices, however, can serve as a measure of the extent to which non-vested benefits may be funded. Plaintiffs argue that the trustees have acted improperly by failing to employ these methods to value the fund's assets.
 
 
 38
 The district court concluded plaintiffs had failed to show that the trustees had used an inappropriate valuation method. They followed the terms of the trust agreement, which provided in Sec. 8.2, "[i]n the event of, and to the extent of, the termination of this Plan for any cause, the Trust Fund, to the extent of such termination, shall be used for the benefit of participants." The section required the use of "the actuarial assumptions underlying this Plan," and the evidence showed that those assumptions included a seven percent anticipated earnings rate. The court rejected the plaintiffs' contention that the trust language applied only to an actual, and not a partial termination. The plain meaning of the words supports the district court's conclusion that the clause "to the extent of" was intended to include partial terminations.
 
 
 39
 The parties do not dispute that the seven percent rate is a conservative one, but the trustees' fiduciary obligations mandate the use of a method that safeguards the fund for the benefit of the vested beneficiaries and does not unfairly discriminate against the nonvested participants.[4] Although plaintiffs suggest other methods of valuation, they have not shown that the formulation required by the trust agreement is unrealistic or unfair to nonvested participants.
 
 
 40
 Plaintiffs suggest that "termination concepts" incorporated in regulations for single-employer pension funds might serve as guidelines for the valuation of the plan here. They contend that an appropriate valuation would use the market rate for the purchase of annuities, a method included in regulations formulated by the Pension Benefit Guarantee Corporation. 29 C.F.R. Sec. 2619.23. That rate, higher than seven percent at the relevant time, might have produced a different picture of the plan's solvency.
 
 
 41
 Other regulations governing single-employer plans, however, provide that in valuing benefits not paid as annuities, the plan must employ reasonable actuarial assumptions. 29 C.F.R. Sec. 2619.26(c)(2). Among the interest assumptions that "will normally be considered reasonable" is "the rate [set] by the plan for determining lump sum amounts prior to the date of termination." That is precisely what the trustees did here. We acknowledge, and plaintiffs concede, that these regulations specifically do not apply to multiemployer pension plans. 29 C.F.R. Sec. 2619.1. But even using them as guidelines fails to support the plaintiffs' position.
 
 
 42
 An additional reason for not applying the single-employer termination procedures in this case lies in a fundamental difference between the two situations. When a plan actually terminates, it has no further need to reinvest its assets. In contrast, a multiemployer fund that experiences the withdrawal of one employer must look ahead and weigh the possibility that the rate of return may be lower at some point in the future. The use of the current market rate as the interest assumption would not recognize this continuing risk. Although the reinvestment risk might have been reduced by the immediate purchase of annuities or a dedicated bond portfolio, plaintiffs concede that nothing compels the trustees to exercise their discretion in that manner.
 
 
 43
 The trustees occupy a delicate position in carrying out their obligation to perform a fair evaluation of the fund. The method they chose has the virtue of having been set in advance, when a partial termination was not contemplated. Furthermore, trustees for both employer and employees had agreed on the provision which was made known to the participants before, not after the termination. Moreover, we acknowledge that the trustees should take a long term-view of the market and not be unduly influenced by fleeting aberrations.
 
 
 44
 Having determined that the valuation method followed by the trustees can withstand the plaintiffs' attack, we conclude the fund has established that its liabilities exceeded its assets.[5] Because no assets were available to fund the nonvested employees' benefits, the failure to declare a partial termination had no consequences with respect to the plaintiffs' rights under ERISA. The district court, accordingly, did not err in entering summary judgment for defendants on the termination claim.
 
 
 45
 The judgments of the district court will be affirmed.
 
 
 
 *
 The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 The union asserts that in 1973 Vornado had attempted a transfer to a single-employer plan, but the employees had resisted that effort
 
 
 [2]
 The Internal Revenue Service has not participated in this case, and we do not address any potential tax problems here. Although the purpose underlying Sec. 411(d)(3) is not altogether obvious, the section does not give plan participants an interest in the employer's tax status. The statute's aim is to force employers to include language favorable to employees in the plan; thus, employees must sue on plan language, not on the statute. See Bruch v. Firestone Fire & Rubber Co., 828 F.2d 134 (3d Cir. 1987)
 
 
 [3]
 Title 29 U.S.C. Sec. 1412(f)(1) provides that the Pension Benefit Guaranty Corporation may prescribe "by regulation such additional requirements with respect to the transfer of assets or liabilities as may be necessary to protect the interest of plan participants and beneficiaries and the [Pension Benefit Guaranty] corporation."
 
 
 [4]
 See Bruch v. Firestone Tire & Rubber Co., 828 F.2d 134 (3d Cir. 1987) (Court normally will not disturb disinterested administrator's decision that aids one group of beneficiaries at the expense of another)
 
 
 [5]
 The parties have agreed that if the seven percent rate was appropriate, the addition of Vornado's withdrawal liability would not have altered the asset-to-liability ratio. Thus, we need not further address that issue