UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 91-1542

RONALD W. CATERINO, ET AL.,

Plaintiffs, Appellants,

v.

J. LEO BARRY, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Edward F. Harrington, U.S. District Judge]

Before

Breyer, Chief Judge,

Cyr and Stahl, Circuit Judges.

Anthony M. Feeherry with whom Marie P. Buckley and Goodwin,

Procter & Hoar were on brief for appellants.

Randall E. Nash with whom James T. Grady and Grady and Dwyer were

on brief for appellees.

November 12, 1993

-1-

BREYER, Chief Judge. For more than thirty years,

New England employees of United Parcel Service ("UPS") have

participated in the New England Teamsters and Trucking

Industry Pension Fund (the "Teamsters Pension Fund"). In

1986, a group of those employees decided they wanted to

leave the Teamsters Pension Fund. They hoped (through

collective bargaining) to secure their employer's assistance

in setting up a separate pension fund covering only UPS New

England employees.

The employees failed to bring about the creation

of a separate fund. And, they blame the Teamsters Pension

Fund trustees for that failure. In particular, they believe

that the trustees have thwarted their efforts to negotiate a

plan switch, not through direct opposition, but by refusing

to permit a transfer of any Teamsters Pension Fund assets to

any new pension fund that they, together with UPS, might

create. They brought this lawsuit against the trustees,

claiming, in relevant part, that the trustees' refusal to

transfer assets violates various laws, including certain

provisions of the Employee Retirement Income Security Act of

1974 (ERISA). See 29 U.S.C. 1104(a)(1), 1414(a).

After a trial, the district court found in the

trustees' favor. The employees now appeal. They argue in

essence that the trustees, in refusing to transfer any

assets to a newly created fund, have violated the fiduciary

obligations that ERISA imposes upon them. We can find no

such violation, however; and, we affirm the judgment in the

trustees' favor.

I

Background

A

The Teamsters Pension Fund

The large, multiemployer Teamsters Pension Fund

pools contributions from nearly two thousand New England

firms. Eight trustees (four Teamster representatives and

four employer representatives) manage the fund, investing

the pooled money and paying guaranteed monthly benefits to

employees who retire. We have read the record with

considerable care to try to understand, from the testimony

and documents, as well as the briefs, how the Teamsters

Pension Fund works. Based on our understanding of the

record, we describe its significant features as follows.

First, employers contribute to the fund at a rate

that, in 1986, varied, among employers, between 36 cents and

$1.66 per employee working hour. The precise rate depends

upon the results of local collective bargaining. Each

-3-
3

employer pays the collective-bargained hourly rate for every

hour that any employee works, whether the employee who

performs the work is young or old, part-time or full-time,

temporary or long-term.

Second, a retiring employee receives a pension

benefit in an amount defined by a schedule that varies

benefits depending primarily upon the employee's length of

service and upon his, or her, employer's contribution rate.

The schedule thus pays the same pension to two retirees who

have worked for the same number of years for employers who

contribute at the same rate. In 1986, for example, an

employee who worked for twenty-five years for an employer

who contributed $1.66 per hour (UPS' actual rate in 1986)

would receive a pension of $900 per month. The benefit

schedule imposes a minimum length of service (ten years as

of 1986, lowered to five in 1990); no employee is entitled

to any pension benefits until he has worked the minimum,

i.e., until his Fund benefits have "vested." The schedule

appears to set a maximum length of service as well (twenty-

five or thirty years, depending on retirement age). Once an

employee works the maximum number of years, additional work

done does not entitle him to any additional benefit.

-4-
4

It is important to understand that the Teamsters

Pension Fund (like most "defined benefit" pension plans and

unlike "defined contribution" plans such as those of many

university employees) does not guarantee any employee that

he will receive a pension that exactly reflects all the

contributions made on behalf of that particular employee

over the years (plus the investment income associated with

those contributions). As we have just said, an individual

employee who works more than the maximum number of years

loses the benefit of some contributions made in respect to

some of his work hours. More important, an employee who

leaves covered employment before his Fund benefits vest

loses the benefit of all contributions made in respect to

his work. Less obviously, employees who are young also lose

the benefit of some contributions. For example, an employee

who works a certain number of years, say fifteen, between

the ages of forty and fifty-five (and then quits) receives

no more upon his retirement at sixty-five than an employee

who works the same fifteen years between the ages of fifty

and sixty-five; yet the contributions made on behalf of the

first employee are likely more valuable, for they have had

more time to accrue investment income before retirement age.

-5-
5

This lack of a perfect fit between individual

contributions and individual benefits may reflect

administrative considerations. It may, for example, reflect

a judgment not to create discrepancies in benefit levels

that turn solely upon the relation between investment market

performance and the time that an individual's contributions

are made. But, the most important reason for the imperfect

fit, as the Ninth Circuit has pointed out, is that the

"excess" contributions made in respect to some workers help

to assure that all workers (who work a reasonable number of

years) will have a decent pension. "A modern defined

benefit pension plan pools contributions for all workers . .

. to provide reasonable pensions for workers who satisfy

reasonable eligibility standards. The formula necessarily

assumes [inter alia] that the pensions of a significant

number of employees may never vest." Phillips v. Alaska

Hotel and Restaurant Employees Pension Fund, 944 F.2d 509,

517 (9th Cir. 1991) (citation omitted), cert. denied, 112 S.

Ct. 1942 (1992); see also Local 144 Nursing Home Pension

Fund v. Demisay, 113 S. Ct. 2252, 2260 (1993) (Stevens, J.,

concurring) ("That some portion of [some defined benefit

plan employees'] contributions will go to benefit [other]

employees . . . is, of course, in the nature of a

-6-
6

multiemployer plan. Such plans . . . pool[] employer

contributions for the joint benefit of all participating

employees.").

At the same time, the plan retains an important

connection between an individual's contributions and that

individual's benefits. By tying benefit levels to years of

service and employer contribution rates, the Fund still

ensures that those employees who do not get the full benefit

of contributions made on their behalf get much of that

benefit (at least if their pension rights have vested).

Third, the Teamsters Pension Fund is a

multiemployer plan. The fact that it is "multiemployer"

means the fund is large, thereby permitting trustees to

diversify investment risks and also lowering administrative

costs per pension dollar. Moreover, multiemployer

"reciprocity" permits a worker to change jobs, among

participating employers, without losing the benefit of past

contributions.

Finally, the Teamsters Pension Fund contains a

special feature -- a "no asset transfer" rule -- which the

UPS employees now challenge. That rule says:

If any employee or group of employees .
. . shall cease to be covered by the
Fund for any reason whatsoever, they
shall not be entitled to receive any

-7-
7

assets of the Fund or portion thereof
nor shall the Trustees be authorized to
make any transfer of assets on behalf of
such employees.

New England Teamsters and Trucking Industry Pension Fund,

Agreement and Declaration of Trust, Article XII, section 9

(1958). According to the trustees, this seemingly absolute

prohibition is modified by the Trust Agreement's next

section. That section requires the trustees to interpret

and apply the Agreement

so as to be in full compliance with all
applicable provisions of law, including
the Employee Retirement Income Security
Act of 1974, as amended.

New England Teamsters and Trucking Industry Pension Fund,

Restated Agreement and Declaration of Trust, Article XII,

section 10 (1982).

B

This Case

In 1986, a group of UPS employees learned that

they could dramatically improve the level of their pensions

were they, with UPS, to withdraw from the Teamsters Pension

Fund and create their own single-employer plan. That is

because, as confirmed in the findings of the district court,

UPS employs a relatively large number of temporary workers,

for whom the company contributes for every hour worked, but

-8-
8

who leave the New England trucking industry before their

pensions vest. The UPS workforce also includes a large

percentage of younger workers. Thus, UPS' contributions

made on behalf of its employees contain a higher-than-

average amount of "excess" contributions. The Teamsters

Pension Fund, being a multi-employer fund, spreads the

benefits of such excess contributions among all participants

in the Fund. In a single-employer plan, the UPS employees

realized, they would not have to share their "excess" with

others. And unshared, UPS' $1.66 per hour contribution, as

of 1986, could buy pensions of $2600 per month (instead of

$900 per month) for UPS employees who retired from UPS

service after twenty-five years. Alternatively, UPS, in a

single-employer plan, could fund the $900 per month pension

for employees retiring after 25 years with a contribution of

less than 70 cents (rather than $1.66) for every employee

hour worked.

The UPS employees' brief explains what happened

after they learned of the potential benefits of a single-

employer plan: "In an effort to remedy their inequitable

treatment within the Teamsters Fund, the UPS Participants

repeatedly petitioned their union leaders to negotiate

[through collective bargaining with UPS management] for a

-9-
9

separate pension plan on their behalf" -- a plan, the record

indicates, that the employees assumed would involve a

transfer of some portion of Teamsters Pension Fund assets

and liabilities to the new fund. "However," the employees

add, "the UPS Participants' efforts to negotiate a separate

UPS pension plan [were] thwarted by the provision in the

Teamster Fund's governing documents which absolutely

prohibits any transfer of assets . . . ." Brief for

Plaintiffs-Appellants at 10.

"Thwarted" in their efforts to take assets from

the Teamsters Pension Fund, and thereby, in their view,

"thwarted" in their efforts to bring about the creation of a

new fund, the UPS employees filed suit against the trustees.

They asked the court either (1) to order the trustees to

create special benefit levels within the Teamsters Pension

Fund for UPS participants (to reflect, in whole or in part,

their favorable actuarial status), or (2) to loosen the

prohibition on asset transfers, thereby, in their view,

making it possible for them to negotiate a plan switch with

UPS management. They argued that the trustees' failure to

do one or the other violated various provisions of the Labor

Management Relations Act (LMRA), 29 U.S.C. 141 et seq.,

and of ERISA. As we have said, after a trial, the district

-10-
10

court entered judgment for the trustees. The employees now

appeal that judgment.

The UPS employees have simplified their claims on

appeal. They have abandoned their demand that the trustees

create a special level of benefits within the Teamsters

Pension Fund. They focus instead upon the trustees' rule-

based refusal to permit any transfer of assets to a new UPS-

only fund.

The passage of time has also simplified this

appeal. The Supreme Court has recently decided a case which

we awaited before deciding this appeal, namely Local 144

Nursing Home Pension Fund v. Demisay, 113 S. Ct. 2252

(1993). Demisay involved LMRA- and ERISA-based challenges

to a refusal, by trustees of a multiemployer pension plan,

to transfer assets to another plan. In its decision, the

Court barred the LMRA-based claims on jurisdictional

grounds, but it remanded (without deciding) the ERISA-based

claims. As a result of that decision, the UPS employees

concede that they "can no longer pursue a claim for relief

under [the applicable section of] the LMRA."

-11-
11

The UPS employees now pursue their remaining

claim, namely that the trustees' rule-based refusal to

transfer assets violates ERISA.

-12-
12

II

Standing

We begin with the trustees' assertion that the

employees lack standing. They concede that the employees

may bring an ERISA action if they have been "adversely

affected by the act or omission of any party . . . with

respect to a multiemployer plan." 29 U.S.C. 1451(a).

They claim, however, that the employees have not been

"adversely affected" by the asset transfer prohibition

principally because, in the trustees' view, "UPS

participants could receive the same level of [pension]

benefits with or without a transfer of assets to a new

single-employer fund." Brief for Defendants-Appellees at 34

(emphasis added). Insofar as we understand this somewhat

counter-intuitive argument, we cannot agree with it.

In evaluating the argument, we have kept

separately in mind two different groups of UPS employees.

In the first group are those employees who, were a switch to

occur, would not yet have any vested Teamsters Pension Fund

rights but who will keep working for several years after the

switch (e.g., a UPS employee who worked, say, four years at

the time of the switch, and continues to work for more than

an additional year). Both sides agree that a new, UPS-only

-13-
13

pension plan would need to give these employees (whom we

shall call "not-yet-vested employees") full credit for their

past years of Teamsters-Pension-Fund-related service (e.g.,

the plan would need to give the four-year employee fully

vested, five-year, rights after one more additional year of

work). Everyone also agrees, however, that the "no asset

transfer" rule means that the new fund would be left without

any assets to pay for these past service credits. The

employees' counsel estimates the "loss of the UPS

Participants' unvested benefits" (which we take to mean the

cost of these past service credits) at approximately $5

million. Brief for Plaintiffs-Appellants at 10 n.1. The

trustees' figures, if anything, appear to place the figure

higher.

In the second group are those employees who, were

a switch to occur, would already have vested rights (we

shall call them "already-vested employees"). Everyone

agrees that a new, UPS-only fund would not have to pay

pensions reflecting the past years of service of these

already-vested employees, for those pension rights would

remain the legal responsibility of the Teamsters Pension

Fund. (In practice, the old fund pays supplemental pension

benefits directly to the employee after retiring.) Since a

-14-
14

new fund would not have to pay for these employees' past

years of service, it would not need assets to help it make

any such payments. And, thus, the new fund would be

somewhat indifferent to the presence of the trustees' "no

asset transfer" rule. The employees recognize this point,

which is why they suggest they would ultimately ask only for

the approximately $5 million -- or some portion thereof --

they claim it would cost to pay the past service credits of

the not-yet-vested employees.

With this distinction in mind, we have turned to

the trustees' "no standing" argument. The argument depends

upon a table (entitled "Transfer of Assets and Liabilities

Vs. No Transfer -- Hancock Numbers") that seems designed to

show that, if asset transfers were permissible, the

following would occur: (1) the new fund would assume all

pension liability for the already-vested employees; (2) it

would obtain assets from the old fund to help pay that

(already-vested employee) liability; but, (3) for reasons

having to do with the inadequate funding of the Teamsters

Pension Fund as a whole, these assets would fall far short

of the amount needed to pay for the already-vested

employees; (4) the asset shortfall (in respect to already-

vested employees) would more than outweigh any benefit to

-15-
15

the new fund through its obtaining a share of the (roughly)

$5 million of assets in respect to the not-yet-vested

employees' pensions; (5) the rules related to UPS'

"withdrawal liability" (a complicated statutory requirement

that employers who leave a multiemployer plan pay a fair

share of the fund's overall deficit) would then somehow even

things out, so that UPS would be neither better nor worse

off with a transfer of assets than without one.

The problem with the table is that we cannot

understand the reasoning that underlies it. The trustees

nowhere explain why a new fund could not request a transfer

only of assets related to not-yet-vested benefits (and

simply not bother with a transfer of assets, and

liabilities, related to vested benefits). And, so long as

the employees limit their request in this, or some similar

way, it seems plain to us that a rule blocking the transfer

of any assets means a poorer fund. We assume, therefore,

that the employees have standing, and we proceed on that

basis.

III

Fiduciary Obligations Under ERISA

The UPS employees' basic argument is that the trustees,

in maintaining a "no asset transfer" rule, have violated the

-16-
16

fiduciary obligations that ERISA imposes upon them. Those

obligations are "strict." NLRB v. Amax Coal Co., 453 U.S.

322, 332 (1981). The trustees must discharge their duties

"with respect to a [multiemployer] plan solely in the

interest of the participants and beneficiaries and . . . for

the exclusive purpose of providing benefits to participants

and beneficiaries," and they must do so "with [] care,

skill, prudence, and diligence." See ERISA, 29 U.S.C.

1104(a)(1); see also id. 1106 (describing other fiduciary

duties of trustees). At the same time, where, as here,

there is no claim of trustee self-dealing or the like, we do

not simply substitute our judgment for that of the trustees.

We review the trustees' decision at a distance. See Mahoney

v. Board of Trustees, 973 F.2d 968, 970-73 (1st Cir. 1992)

(refusing to apply close scrutiny to a pension fund trustee

decision even where mild self-dealing was involved); cf.

Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 958 (Del.

1985) ("[U]nless it is shown by a preponderance of the

evidence that the [fiduciaries'] decisions were primarily

based on perpetuating themselves in office, or some other

breach of fiduciary duty such as fraud, overreaching, lack

of good faith, or being uninformed, a Court will not

substitute its judgment for that of the [fiduciaries].").

-17-
17

The decision to maintain a "no asset transfer" rule requires

the trustees to balance obligations that run both to

employees who may wish to leave the fund and to those who

wish to stay. As is well-established, courts set aside this

type of trustee management decision only if it is "arbitrary

and capricious in light of the trustees' responsibility to

all potential beneficiaries." Clearly v. Graphic

Communications Int'l Union Supplemental Retirement and

Disability Fund, 841 F.2d 444, 449 (1st Cir. 1988) (citing

other First Circuit cases on point).

We cannot say that the trustees' decision here is

arbitrary. In reaching this conclusion, we have considered

two possible arguments. The first (implicit in much of what

the UPS employees say) is that the Teamsters Pension Fund

has treated them unfairly while they have remained in the

Fund by not giving them higher pension benefits than other

employee groups with less favorable actuarial

characteristics. On this view, the sole fact that they were

earning (as of 1986) a $900 pension when they could have

been earning a $2600 pension had the Fund treated them as a

separate actuarial group demonstrates this unfairness. And,

arguably, this "unfair" treatment warrants some special

transfer of assets should they leave the Fund.

-18-
18

The problem with this argument is that the

discrepancy between $900 and $2600 does not, by itself,

indicate that the Teamsters Pension Fund treated the

employees unfairly (and nor have the employees offered any

other evidence of unfair treatment while in the Fund). As

discussed above, see supra pp. 6-7, multiemployer, defined-

benefit pension funds provide their participants a whole

cluster of benefits, most notably, a guaranteed decent

pension for all longtime workers. And as also discussed

above, such funds do this largely by collecting "excess"

contributions in respect

to certain kinds of employees such as temporary workers

(whose benefits never vest), young workers, and super-

longterm employees, and by sharing these excess

contributions with all the employees in the fund, not just

with the employees of employers who paid the excess.

Accordingly, a basic objective of these funds would be

undermined if every employee group (such as UPS) with a

disproportionate share of excess contributions (and there

may be many others) wanted special pension levels to reflect

that fact. It is thus no coincidence that, according to the

findings of the district court, no other regional Teamster

pension fund provides special benefits for actuarially

-19-
19

favorable employee groups, and only one non-Teamster fund in

the entire country does so.

In short, UPS and its employees could have quit

the Teamsters Pension Fund at any time, but so long as they

stayed -- and enjoyed the guaranteed, mobile pension

benefits the Fund provides -- there seems nothing obviously

unfair in denying them special (e.g., $2600) benefits. The

UPS employees, by abandoning on appeal their demand for such

benefits, seem, in effect, to concede the point. (We add

that, on appeal, the UPS employees also seem to suggest that

a new fund would not be entitled to an amount of assets

anywhere near as large as the amount that would reflect the

UPS employees' "excess" contribution.)

The second basic argument that the trustees have

acted arbitrarily focuses on the "no transfer" rule. The

employees argue that if they quit the Teamsters Pension Fund

(because they no longer, in the future, want to share their

excess contributions), the rule would prevent them, as

explained in the standing section, supra Part II, from

getting any assets to help pay for the past service credits

of the not-yet-vested employees. And, it would prevent the

new fund from getting such assets even though UPS has

dutifully made contributions into the old fund on behalf of

-20-
20

these same employees. This, they say, is unfair. The UPS

employees concede, again as mentioned in the standing

section, that the "no transfer rule" is a wash with respect

to already-vested employees and, to that extent, the rule is

not unfair. They also recognize that, as long as the

Teamsters Pension Fund has liabilities in excess of its

assets, they might not be entitled to get funds to cover all

of the past service credits of not-yet-vested employees; yet

they say they are entitled to funds to cover at least some.

Can the trustees' decision not to transfer even

one dime of the Fund's assets attributable to not-yet-vested

pension rights (keeping those assets for the benefit of

other non-UPS participants) be considered reasonable?

Although we find the question a difficult one, we believe

the answer is "yes" -- at least in the absence of some

special circumstance that the record here does not reveal.

In arriving at this conclusion, we fully recognize that the

trustees' blanket refusal operates in practice like a

penalty for withdrawing from the Fund -- a penalty somewhat

similar to the penalties bank customers pay for early

withdrawals from CDs and the like, but a penalty

nonetheless. Whether such a penalty is reasonable depends,

-21-
21

in our view, upon whether it serves a legitimate deterrent

purpose, upon whether the participants in the fund know

about it in advance, and upon its size in relation to its

function.

The penalty's deterrent function here is

legitimate. Multiemployer, defined-benefit pension plans

almost inevitably produce some actuarially-favored, and some

actuarially-disfavored, groups. Such plans have a strong

interest in discouraging actuarially-favored employee groups

from withdrawing. For the employees left behind, withdrawal

means, among other things, a smaller fund, consequently

greater investment costs and risks, and fewer employers for

whom those employees can work without losing their accrued

years of service. Those left behind, moreover, also lose

the benefit of sharing the departing employer's "excess"

contributions, say, those related to temporary employees.

Some departing employees, we should remind them, would be in

the same situation had personal circumstances earlier led

them to switch to actuarially-disfavored employers. Also,

departing employees, up until the time of departure, have

enjoyed the benefits of the large fund that departure

disincentives have helped to maintain.

-22-
22

Moving to the next inquiry, we think that

employees leaving the Fund might reasonably expect to incur

some such departure penalty (not to be confused, by the way,

with "withdrawal liability," mentioned supra pp. 14-15).

The governing document of the Teamsters Pension Fund has

contained the "no asset transfer" clause since the Fund's

creation. More importantly, the penalty concerns the loss

of a special kind of asset, namely the loss of assets

related to not-yet-vested contributions. And, participants

in many pension funds normally lose such assets entirely

when they leave fund-covered employment prior to vesting.

Departing employees leave Teamsters Pension Fund-covered

employment whether they quit the industry or whether, by

switching plans, they and their employer leave the Teamster

Pension Fund. Of course, the two activities -- quitting a

job and switching plans -- are not the same. But, they are

closely enough related to make the penalty of an

unsurprising kind (and, of course, from the point of view of

the remaining participants, the effect of departure is the

same).

It also seems to us that the size of the

withdrawal penalty is relatively modest. The record

suggests that the employees can take advantage of their

-23-
23

actuarially favorable position by leaving the Teamster Fund

even without an asset transfer, albeit not quite to the same

degree. In absolute terms, we have already mentioned that

the employees appear to value the not-yet-vested employee

liability at roughly $5 million; we have also already

mentioned that the employees recognize that they would be

entitled, the Teamsters Pension Fund being in debt, to an

amount of assets to cover only some, not all, of this

liability -- i.e., an amount less than $5 million, perhaps

much less. (Our own crude calculations, based on figures

from the trustees' table, puts the amount at $3.7 million.)

Whatever the exact figure, it is a fairly small amount

compared to other amounts such as UPS' annual contributions

($18 million dollars as of 1986, according to the employees'

actuaries) or the "withdrawal liability" UPS would likely

have to pay upon departure (in the tens of millions of

dollars, again as of 1986).

Finally, if the "no asset transfer" rule costs the

new fund too much, there is a safety valve. The employees

can automatically entitle themselves to a share of fund

assets should the matter become so critically important to

them that they take the drastic step of changing collective

-24-
24

bargaining representatives (i.e., of leaving the Teamsters).

See ERISA, 29 U.S.C 1415(a).

Ultimately, the weighing of the conflicting

interests here at issue -- those of departing employees in

obtaining the nonvested share of assets versus those of most

fund participants in discouraging departures -- is up to the

trustees (who reflect the interests both of employers and

the employees, through their collective bargaining

representatives). The question is close enough so that, in

our view, the ultimate weighing is not up to the courts.

The treatment of the departing employees (that they must

forfeit unvested rights) is not so unfair as to make the

rule arbitrary. We do not say that any rule that blocks

asset transfers is reasonable, nor that the present "no

transfer" rule is reasonable in all circumstances. We

simply say that the record before us does not demonstrate

that it is arbitrary as applied to the circumstances before

us. Thus, we do not find a violation of the basic fiduciary

obligations that ERISA imposes upon trustees.

IV

ERISA Section 4234(a)

-25-
25

The UPS employees also claim that the "no asset

transfer" rule violates ERISA section 4234(a), which says,

in relevant part, that

[a] transfer of assets from a
multiemployer plan to another plan shall
comply with asset-transfer rules which
shall be adopted by the multiemployer
plan and which . . . do not unreasonably
restrict the transfer of plan assets in
connection with the transfer of plan
liabilities.

29 U.S.C. 1414(a). They argue (1) that the provision is

applicable to the instant case, (2) that the trustees have

failed to "adopt[]" any "asset-transfer rules," and (3) that

any such rules they might have adopted are "unreasonably

restrict[ive]."

The trustees do not agree that the provision

applies to this case. Specifically, they argue that it

applies only where a fund's trustees intend to transfer some

of its liabilities -- not the situation here -- and the

question is whether, or to what extent, the trustees must

allow assets to accompany the transferred liabilities. This

is the interpretation of the statute that the Third Circuit

has endorsed, and with which, for the reasons stated in that

opinion, we agree. See Vornado, Inc. v. Trustees of The

Retail Store Employees' Union Local 1262, 829 F.2d 416 (3d

Cir. 1987).

-26-
26

Even assuming that the provision applies, however,

we cannot accept the employees' claim that the trustees have

failed to "adopt[]" any "asset-transfer rules." The "no

asset transfer" is itself a rule about asset transfers.

Moreover, that rule is not quite as absolute as it sounds,

for the trustees acknowledge that, if ERISA's fiduciary duty

rules require them to transfer assets, the rule permits them

to comply. The Trust Agreement itself, in Article XII,

section 10, says that they must do so. See supra p. 8.

Further, the asset transfer prohibition, as so interpreted,

is not "unreasonably restrict[ive]," for the very reasons we

have set forth in Part III, supra.

For the reasons stated, the judgment of the

district court is Affirmed.
Affirmed

-27-
27