GANTON TECHNOLOGIES, INC., and Shirley Klamm, Ronald Brown and Craig Small, as employees of Ganton Technologies, Inc., Plaintiffs–Appellants,

v.

NATIONAL INDUSTRIAL GROUP PENSION PLAN, a Multi-employer Trust Fund, Stanley L. Eisner, Ronald William Borst, Michael Kelly, A.E. Samson, Richard Shirley, Milford E. Woodbeck, Elmer Chatak, Dominick D'Ambrosio, Edgar Ball, Odessa Komer, and Harvey Martin, as Trustees of the National Industrial Group Pension Plan, Defendants–Appellees.

No. 292, Docket 95–7323.

United States Court of Appeals, Second Circuit.

Argued Oct. 2, 1995.

Decided Feb. 7, 1996.

H. Roderic Heard, Chicago, IL (Cheryl A. Kettler, Kimberly E. Roy, Wildman, Harrold, Allen & Dixon, Chicago, IL, Thomas J. Smith, Mark R. Crosby, Thomas M. Geisler, Wildman, Harrold, Allen, Dixon & Smith, New York City, of counsel), for Appellants.

Linda E. Rosenzweig, New York City (Philip M. Berkowitz, Epstein Becker & Green, New York City, of counsel), for Appellees.

Before: MESKILL, KEARSE and ALTIMARI, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment of the United States District Court for the Southern District of New York, Stanton, *J.*, granting defendant-appellee National Industrial Group Pension Plan's (NIGPP) motion for summary judgment and dismissing plaintiff-appellant Ganton Technologies, Inc.'s (Ganton) claim that NIGPP violated the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, and that the trustees of NIGPP violated their fiduciary duties imposed by ERISA. The claims arose out of Ganton's withdrawal from NIGPP and NIGPP's denial of Ganton's request for a transfer of plan assets to Ganton, which desired to start an independent pension plan.

## BACKGROUND

From 1967 to 1992, Ganton and its predecessor in interest, Racine Die Cast Company (Racine) contributed to NIGPP on behalf of their employees pursuant to collective bargaining agreements with United Auto Workers Local 627. Racine entered into a participation agreement dated August 14, 1967 by which Racine agreed to be bound by the NIGPP Agreement and Declaration of Trust (the "Plan") and to contribute to NIGPP.

This lawsuit arose because Ganton and its employees believed they could gain more benefits from their contributions if they withdrew from NIGPP, a multiemployer pension plan, and formed their own single-employer pension plan. Contributions to multiemployer pension plans are negotiated by labor

**464**

unions and individual employers, but the size of the pension paid to employees is determined by the plan.

Multiemployer plans, as the name indicates, consist of several employers that contribute to one plan. The assets of the plan are not segregated into accounts.[1] The common assets are invested and used to pay pensions to those employees of the participating employers whose rights vest according to the requirements set out in the plan document.

Multiemployer plans like NIGPP have liabilities and assets. The assets consist of the contributions made by participating employers in accordance with agreements made with the union representing its employees. The liabilities consist of the payments the plan must make to employees whose rights vest, generally consisting of a stream of payments beginning when an employee reaches a certain age and has retired.

The amount paid in benefits by the plan will be the same for employees of equal seniority whose employers contribute at the same rate, but there is no guaranteed tie between the amount contributed on behalf of a particular employee and the amount the employee actually will receive. *See Caterino v. Barry,* 8 F.3d 878, 879–80 (1st Cir.1993) (describing multiemployer Teamsters Pension Fund). In this case, Ganton contends that it could have provided pension benefits for its employees equal to those its employees receive under NIGPP, but for a lesser contribution, had Ganton created a single-employer plan itself. Ganton claimed this to be the case because of the "changed demographics" of its workforce.[2] Ganton considers any portion of the contributions it made that would not have been necessary in a

single-employer plan to be "surplus" in which it has an interest.

Ganton requested that NIGPP transfer NIGPP's liabilities relating to the pensions of Ganton's employees and that NIGPP concurrently transfer to Ganton's new plan the portion of NIGPP assets attributable to Ganton's past contributions. Ganton then would use the assets to fund its new single-employer plan (the Ganton Plan), and would pay the already vested pensions itself. In this way, Ganton employees would retain their pensions and Ganton could take the "surplus" it would receive back from NIGPP and put it to other uses. NIGPP refused, and this action was commenced.

As we discuss below, nothing prevents Ganton and its employees from leaving NIGPP to start their own plan for hours worked in the future. The question is whether Ganton and its employees can force NIGPP to transfer liabilities accrued in the past and the supporting plan assets to Ganton's plan, so the Ganton Plan can take the place of NIGPP as the provider of Ganton employees' pensions for the already accrued pension benefits.

### A. *Proceedings Before the District Court*

Ganton and three of its employees brought this suit in the Southern District of New York against NIGPP, a multiemployer defined-benefit pension plan, claiming that NIGPP violated ERISA and the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 141–187, by refusing to transfer to the Ganton Plan that portion of NIGPP's assets attributable to Ganton's contributions.[3] Plaintiffs also alleged that the individual trustees violated their fiduciary duties to

---

**1.** In fact, ERISA specifically states that, except as provided under ERISA, the participating employers have no interest in plan assets. ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1). This addresses the original motivation for ERISA, namely, the propensity for employers to ransack the assets supporting their private pension plans to the detriment of their pensioners.

**2.** The pension amounts are determined by actuarial calculations based on the characteristics of the entire pool of employees participating in the Plan. Ganton's employees were, on

average, younger than the employees of the other participating employers. Younger employees' pensions will be the same as older employees' pensions even though the contributions made on behalf of the younger employees will accrue investment income for the fund over a longer period, making those contributions more valuable. *Caterino,* 8 F.3d at 879–80.

**3.** Ganton withdrew its LMRA claim in the district court under Fed.R.Civ.P. 41(a)(1)(i).

Ganton's employees by failing to conduct an individualized review of Ganton's request and by denying the request in violation of the Plan documents. Defendants sought summary judgment dismissing Ganton's ERISA claims. The district court found that there were no material factual disputes and granted summary judgment in favor of defendants. Ganton brought this appeal.

### B. Standard of Review

We review *de novo* the district court's grant of summary judgment. *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995).

### C. Section 1414 Claim

Appellants claim that NIGPP was required under ERISA § 4234(a), 29 U.S.C. § 1414(a), to transfer the plan assets attributable to Ganton's contributions to the Ganton Plan on request. Section 1414(a) states that:

A transfer of assets from a multiemployer plan to another plan shall comply with asset-transfer rules which shall be adopted by the multiemployer plan and which—

(1) do not unreasonably restrict the transfer of plan assets in connection with the transfer of plan liabilities, and

(2) operate and are applied uniformly with respect to each proposed transfer, except that the rules may provide for reasonable variations taking into account the potential financial impact of a proposed transfer on the multiemployer plan.

29 U.S.C. § 1414(a). At issue are two competing interpretations of section 1414(a).

### 1. The District Court's Construction

The district court reasoned that section 1414(a)(1) requires that *if* a plan chooses to transfer liabilities to another plan after such a transfer is requested, then the rules for such transfers must not unreasonably restrict the concurrent transfer of the assets that support those liabilities. Section 1414(a)(2) requires that the rules plans promulgate to ensure that assets are transferred along with the liabilities as required by 1414(a)(1) are themselves applied uniformly. In the end, the district court reasoned, the decision whether to transfer liabilities, and

thus the assets along with them, is in the discretion of the plan trustees.

### 2. The Appellant's Construction

Ganton argues that although section 1414(a)(1) explicitly forbids only the "unreasonabl[e] restrict[ion]" of plan asset transfers "in connection with" a transfer of plan liabilities, the section requires plans not to restrict the transfer of assets and liabilities on the request of a participating employer unreasonably. In other words, instead of a rule that requires plans to release assets when they release liabilities, appellant argues that section 1414(a)(1) means that a plan cannot "unreasonably restrict" the transfer of assets and liabilities together when a participating employer requests such a transfer. Under Ganton's construction, a plan can only refuse an asset transfer if it determines that such a transfer would financially threaten the plan.

### 3. Discussion

We find support for the district court's construction in the opinion of Justice (then-Chief Judge) Breyer, writing for the First Circuit in *Caterino,* 8 F.3d 878. In *Caterino,* the First Circuit faced the question of whether section 1414 required the transfer of assets, and held that section 1414 requires the transfer of plan assets only when the plan agrees to transfer liabilities to another plan. *Id.* at 885; *Vornado, Inc. v. Trustees of The Retail Store Employees' Union Local 1262,* 829 F.2d 416, 419–21 (3d Cir.1987). We agree with the First and Third Circuits that the purpose of the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. §§ 1381–1461, and the workings of multiemployer plans eliminate any ambiguity in section 1414.

The construction of section 1414 advanced by appellant is inconsistent with the policies behind ERISA as it applies to multiemployer plans. In 1980, Congress, through the passage of the MPPAA, addressed a problem that arose because of the manner in which ERISA applied to multiemployer plans. As the Supreme Court recently stated, ERISA, before the passage of the MPPAA

encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat. Consequently, a plan's financial troubles could trigger a stampede for the exit-doors, thereby ensuring the plan's demise. *Milwaukee Brewery Workers' Pension Plan v. Jos. Schlitz Brewing Co.,* —— U.S. ——, ——, 115 S.Ct. 981, 985, 130 L.Ed.2d 932 (1995). As the Supreme Court recognized, in the unrelated context of MPPAA's mandatory withdrawal liability, the policy behind the MPPAA was to *discourage* employers from withdrawing from financially troubled plans so that the plans could better weather the financial storms confronting them. Ganton's construction of section 1414 would not only give employers the power to withdraw from plans when they believed they could provide a better pension for their employees (a right they clearly do have), but would also entitle the withdrawing employers to take all of the plan assets attributable to their past contributions with them. The power of participating employers to separate unilaterally and completely from a multiemployer plan—with respect to past contributions and obligations—is not what Congress intended. *Vornado,* 829 F.2d at 420 (noting that such a "shift in initiative from trustee to employer is inconsistent with the thrust of [the MPPAA]").

■ It is important to note that employers who believe themselves able to provide better pensions for their employees in another multiemployer plan or in a single-employer plan are not prevented from withdrawing as to future contributions and obligations. Employers are free to withdraw from the plan, as Ganton did, but they must start their new plan without the benefit of past contributions unless the plan they leave is willing to transfer assets and liabilities to the new plan. To protect the financial stability of multiemployer plans, the plans have the discretion to refuse an employer's request for a transfer of liabilities and assets. We hold that section 1414 does not require multiemployer plan trustees to transfer assets and liabilities to plan participants or to another plan at their request, rather it only requires trustees to transfer assets "in connection with" liabilities should they agree, in their discretion, and in accordance with their fiduciary duties, to transfer liabilities. Thus Ganton was not automatically entitled to an asset transfer under section 1414.

### D. *Fiduciary Duty Claims*

■ Ganton also claims that the trustees violated ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), by their erroneous interpretation and application of NIGPP Plan section 8.03. Section 1104(a)(1)(D) requires the trustees to administer the plan in accordance with plan documents. Ganton contends that section 8.03 of the Plan requires an individualized determination of each request, and that the NIGPP trustees' adoption of a "blanket" no-asset transfer rule, and refusal to consider the interests of the departing Ganton employees violated their fiduciary duty to adhere to Plan section 8.03.

Article IX, section 9.01 of the NIGPP Plan document gives the Board of Trustees the authority to "resolve all disputes and ambiguities relating to the interpretation of the Plan, and the application of the terms of the Plan to any circumstances and the decisions of the Board in all such matters will be final." The application of Plan section 8.03, which states that the Board "may ... approve the transfer to another qualified plan of ... a portion of Plan Assets ... if that action is deemed by the Board to be in the best interests of the Plan and if said transfer is consistent with the rules of the Board and the requirements of ... Federal law," when considered in light of Plan section 9.01, gives the Board discretion to approve or deny asset transfers.

■ When plan documents give the trustees the discretion to interpret plan terms, we will not substitute our judgment for theirs unless the trustees' interpretation is arbitrary and capricious. *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989); *Caterino,* 8 F.3d at 883. The district court found that the Board, even though it had the "blanket rule" in place, did, in fact, give individual-

ized consideration to Ganton's request for an asset transfer by reviewing the wisdom of continuing the blanket rule in the face of Ganton's request. We will not upset this finding unless we determine that it is clearly erroneous, which it is not. Furthermore, we agree with the district court's statement that the blanket rule would be permissible as long as the Board periodically reviewed the wisdom and reasonableness of the rule. Where the trustees reasonably determine that certain transactions (such as asset transfers) may place the fund at risk, it is not necessarily unreasonable for them to refuse to reevaluate their decision every time such a request is made. The trustees were informed by their actuary that continued asset transfers would jeopardize the fund. This analysis was supported by another actuary's affidavit presented to the district court.

■ Ganton's second fiduciary duty-based claim is that the trustees failed to act "solely in the interest of the participants and beneficiaries," as required by 29 U.S.C. § 1104(a)(1). This claim is unpersuasive. Ganton and its employees sought to recover the assets attributable to their contributions in order to fund the Ganton Plan, but such a transfer would threaten the financial well being of the Plan, to the detriment of the remaining employees. Thus the trustees were required to balance the interests of the departing employees and the remaining employees. *Caterino*, 8 F.3d at 883–85; *Vornado*, 829 F.2d at 421.

The trustees had two choices. They could grant the asset transfer to Ganton giving an advantage to the departing employees but injuring the Plan and its remaining participants, or refuse the transfer request and make it more difficult for Ganton to start its new plan. Refusing the transfer actually protected all the participants—including Ganton's employees, vested and not-yet-vested—by guaranteeing the stability of the Plan and immediately vesting the interests of the departing employees. We cannot say that the trustees acted "arbitrarily" in choosing the option that preserved the Plan's assets and did not significantly harm Ganton's employees. *Morse v. Stanley*, 732 F.2d 1139, 1146 (2d Cir.1984) (relying on fact that trust-

ees' decision preserved the trust corpus as grounds for upholding decision to deny accelerated benefits to group of departing employees).

Ganton cites *Caterino* for the proposition that a blanket no-transfer rule is not *always* reasonable and that the trustees' fiduciary duties require that the trustees balance the interests of those employees who wish to leave the plan and those who wish to remain. The *Caterino* Court, however, addressed the reasonableness of a blanket no asset-transfer rule where the not-yet-vested employees who wished to leave that plan were faced with losing the benefit of the contributions associated with their work hours. *Caterino*, 8 F.3d at 884–85. The *Caterino* plaintiffs' departure would have resulted in the not-yet-vested departing employees losing all the benefit of the contributions made on their behalf to the original multiemployer plan. The First Circuit believed such a loss was reasonable in the absence of some special circumstances. *Id.* at 884. The potential for this kind of loss is not present in this case because, as the district court found, NIGPP automatically vests the rights of the not-yet-vested departing employees upon their employer's withdrawal from the Plan, thus preventing a loss such as the one in *Caterino*. The *Caterino* Court specifically noted that as to the already vested employees, the refusal to transfer assets was "a wash," and thus "*not* unfair." *Id.* The automatic vesting provision in the NIGPP makes the refusal to transfer assets "a wash" with regard to the not-yet-vested employees as well. Thus, the balancing conducted by the *Caterino* Court, meant to ensure consideration of the not-yet-vested departing employees' interest in their accrued benefits, is unnecessary in this case.

Ganton also claims that the trustees acted unreasonably in denying Ganton the benefit of the "surplus" payments into the NIGPP fund by Ganton. However, this claim is at odds with the workings of multiemployer plans in general. As then-Chief Judge Breyer stated in *Caterino*, defined-benefit multiemployer plans such as this one do "*not* guarantee any employee that he will receive a pension that *exactly* reflects all the contributions made on behalf of *that particular*

*employee* over the years." *Id.* at 879. This discrepancy results from one purpose of multiemployer plans, which is to "assure that *all* workers (who work a reasonable number of years) will have a decent pension." *Id.* at 880. The pooling aspect of these plans provides security to all participants at the risk of receiving less than maximum possible benefits. For instance, in *Caterino,* the plaintiffs could have obtained pension rights of $2,600 per month had they formed a single-employer plan, but instead, because of the actuarial characteristics of the employees of the other employers, they earned the right to only $900 per month. *Id.* at 883. The First Circuit recognized, though, that this was the risk the plaintiffs took in exchange for other benefits. *Id.* at 883–84. Such is the risk inherent in joining a multiemployer plan. As the Supreme Court has noted,

> [a] rational employer hopes that its employees will vest at a rate above the average for all employees of contributing employers, and that, in this way, it will pay less than it would have by creating a single-employer plan. But the rational employer also appreciates the foreseeable risk that circumstances may produce the opposite result.

*Concrete Pipe & Products of Cal. v. Construction Laborers Pension Trust,* 508 U.S. 602, 638–40, 113 S.Ct. 2264, 2288, 124 L.Ed.2d 539 (1993). Thus the trustees did not act arbitrarily when they refused to transfer assets, thus preventing appellant's enjoyment of the "surplus." By the nature of these plans, Ganton lost out because of its employees' actuarial characteristics, not by any unreasonable decision by the trustees.

Ganton makes much of the fact that the Board routinely granted asset transfer requests like the one made by Ganton in the past—before the adoption of the no-transfer policy in 1984. As we stated in *Morse,* the mere fact that the trustees maintained a practice of granting requests "does not mean that they had donned a discretionary straitjacket which held them bound to grant [similar requests] in all cases as a matter of

course." *Morse,* 732 F.2d at 1144 (addressing requests for acceleration of benefit payments to departing employees). Rather, the trustees maintain the broad discretion to act in the best interests of all participants. *Id.*

Ganton also claims that the trustees used the Ganton "surplus" to absolve the deficits of the other participating employers and that this demonstrates the unreasonableness of a decision not to transfer assets for financial reasons. To the contrary, the "surplus" was used for proper purposes. As we stated above, the "surplus" never belonged to Ganton, rather it belonged to the Plan which could use the funds to strengthen any weakness in the plan.[4]

## CONCLUSION

For the reasons stated above, the judgment of the district court is affirmed.

---

4. The "misuse" of the Ganton "surplus" by NIGPP was allegedly in NIGPP's offering deficit employers the opportunity to withdraw without incurring withdrawal liability after Ganton withdrew. This process would actually have the effect of strengthening the plan if it eliminated employers that, because of demographics, were draining the Plan Fund.