USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 91-1542 RONALD W. CATERINO, ET AL., Plaintiffs, Appellants, v. J. LEO BARRY, ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Edward F. Harrington, U.S. District Judge] ___________________ ____________________ Before Breyer, Chief Judge, ___________ Cyr and Stahl, Circuit Judges. ______________ ____________________ Anthony M. Feeherry with whom Marie P. Buckley and Goodwin, _____________________ _________________ ________ Procter & Hoar were on brief for appellants. ______________ Randall E. Nash with whom James T. Grady and Grady and Dwyer were _______________ ______________ _______________ on brief for appellees. ____________________ November 12, 1993 ____________________ -1- BREYER, Chief Judge. For more than thirty years, ___________ New England employees of United Parcel Service ("UPS") have participated in the New England Teamsters and Trucking Industry Pension Fund (the "Teamsters Pension Fund"). In 1986, a group of those employees decided they wanted to leave the Teamsters Pension Fund. They hoped (through collective bargaining) to secure their employer's assistance in setting up a separate pension fund covering only UPS New England employees. The employees failed to bring about the creation of a separate fund. And, they blame the Teamsters Pension Fund trustees for that failure. In particular, they believe that the trustees have thwarted their efforts to negotiate a plan switch, not through direct opposition, but by refusing to permit a transfer of any Teamsters Pension Fund assets to any new pension fund that they, together with UPS, might create. They brought this lawsuit against the trustees, claiming, in relevant part, that the trustees' refusal to transfer assets violates various laws, including certain provisions of the Employee Retirement Income Security Act of 1974 (ERISA). See 29 U.S.C. 1104(a)(1), 1414(a). ___ After a trial, the district court found in the trustees' favor. The employees now appeal. They argue in essence that the trustees, in refusing to transfer any assets to a newly created fund, have violated the fiduciary obligations that ERISA imposes upon them. We can find no such violation, however; and, we affirm the judgment in the trustees' favor. I Background __________ A The Teamsters Pension Fund __________________________ The large, multiemployer Teamsters Pension Fund pools contributions from nearly two thousand New England firms. Eight trustees (four Teamster representatives and four employer representatives) manage the fund, investing the pooled money and paying guaranteed monthly benefits to employees who retire. We have read the record with considerable care to try to understand, from the testimony and documents, as well as the briefs, how the Teamsters Pension Fund works. Based on our understanding of the record, we describe its significant features as follows. First, employers contribute to the fund at a rate that, in 1986, varied, among employers, between 36 cents and $1.66 per employee working hour. The precise rate depends upon the results of local collective bargaining. Each -3- 3 employer pays the collective-bargained hourly rate for every _____ hour that any employee works, whether the employee who ___ performs the work is young or old, part-time or full-time, temporary or long-term. Second, a retiring employee receives a pension benefit in an amount defined by a schedule that varies benefits depending primarily upon the employee's length of service and upon his, or her, employer's contribution rate. The schedule thus pays the same pension to two retirees who have worked for the same number of years for employers who contribute at the same rate. In 1986, for example, an employee who worked for twenty-five years for an employer who contributed $1.66 per hour (UPS' actual rate in 1986) would receive a pension of $900 per month. The benefit schedule imposes a minimum length of service (ten years as of 1986, lowered to five in 1990); no employee is entitled to any pension benefits until he has worked the minimum, i.e., until his Fund benefits have "vested." The schedule appears to set a maximum length of service as well (twenty- five or thirty years, depending on retirement age). Once an employee works the maximum number of years, additional work done does not entitle him to any additional benefit. -4- 4 It is important to understand that the Teamsters Pension Fund (like most "defined benefit" pension plans and unlike "defined contribution" plans such as those of many university employees) does not guarantee any employee that ___ he will receive a pension that exactly reflects all the _______ contributions made on behalf of that particular employee _________________________ over the years (plus the investment income associated with those contributions). As we have just said, an individual employee who works more than the maximum number of years loses the benefit of some contributions made in respect to some of his work hours. More important, an employee who leaves covered employment before his Fund benefits vest loses the benefit of all contributions made in respect to ___ his work. Less obviously, employees who are young also lose the benefit of some contributions. For example, an employee who works a certain number of years, say fifteen, between the ages of forty and fifty-five (and then quits) receives no more upon his retirement at sixty-five than an employee who works the same fifteen years between the ages of fifty and sixty-five; yet the contributions made on behalf of the first employee are likely more valuable, for they have had more time to accrue investment income before retirement age. -5- 5 This lack of a perfect fit between individual contributions and individual benefits may reflect administrative considerations. It may, for example, reflect a judgment not to create discrepancies in benefit levels ___ that turn solely upon the relation between investment market performance and the time that an individual's contributions are made. But, the most important reason for the imperfect fit, as the Ninth Circuit has pointed out, is that the "excess" contributions made in respect to some workers help to assure that all workers (who work a reasonable number of ___ years) will have a decent pension. "A modern defined benefit pension plan pools contributions for all workers . . . to provide reasonable pensions for workers who satisfy reasonable eligibility standards. The formula necessarily assumes [inter alia] that the pensions of a significant __________ number of employees may never vest." Phillips v. Alaska ________ ______ Hotel and Restaurant Employees Pension Fund, 944 F.2d 509, ____________________________________________ 517 (9th Cir. 1991) (citation omitted), cert. denied, 112 S. _____ ______ Ct. 1942 (1992); see also Local 144 Nursing Home Pension _________ ________________________________ Fund v. Demisay, 113 S. Ct. 2252, 2260 (1993) (Stevens, J., ____ _______ concurring) ("That some portion of [some defined benefit plan employees'] contributions will go to benefit [other] employees . . . is, of course, in the nature of a -6- 6 multiemployer plan. Such plans . . . pool[] employer contributions for the joint benefit of all participating employees."). At the same time, the plan retains an important connection between an individual's contributions and that individual's benefits. By tying benefit levels to years of service and employer contribution rates, the Fund still ensures that those employees who do not get the full benefit of contributions made on their behalf get much of that ____ benefit (at least if their pension rights have vested). Third, the Teamsters Pension Fund is a multiemployer plan. The fact that it is "multiemployer" means the fund is large, thereby permitting trustees to diversify investment risks and also lowering administrative costs per pension dollar. Moreover, multiemployer "reciprocity" permits a worker to change jobs, among participating employers, without losing the benefit of past contributions. Finally, the Teamsters Pension Fund contains a special feature -- a "no asset transfer" rule -- which the UPS employees now challenge. That rule says: If any employee or group of employees . . . shall cease to be covered by the Fund for any reason whatsoever, they shall not be entitled to receive any -7- 7 assets of the Fund or portion thereof nor shall the Trustees be authorized to make any transfer of assets on behalf of such employees. New England Teamsters and Trucking Industry Pension Fund, Agreement and Declaration of Trust, Article XII, section 9 (1958). According to the trustees, this seemingly absolute prohibition is modified by the Trust Agreement's next section. That section requires the trustees to interpret and apply the Agreement so as to be in full compliance with all applicable provisions of law, including the Employee Retirement Income Security Act of 1974, as amended. New England Teamsters and Trucking Industry Pension Fund, Restated Agreement and Declaration of Trust, Article XII, section 10 (1982). B This Case _________ In 1986, a group of UPS employees learned that they could dramatically improve the level of their pensions were they, with UPS, to withdraw from the Teamsters Pension Fund and create their own single-employer plan. That is because, as confirmed in the findings of the district court, UPS employs a relatively large number of temporary workers, for whom the company contributes for every hour worked, but -8- 8 who leave the New England trucking industry before their pensions vest. The UPS workforce also includes a large percentage of younger workers. Thus, UPS' contributions made on behalf of its employees contain a higher-than- average amount of "excess" contributions. The Teamsters Pension Fund, being a multi-employer fund, spreads the benefits of such excess contributions among all participants in the Fund. In a single-employer plan, the UPS employees realized, they would not have to share their "excess" with others. And unshared, UPS' $1.66 per hour contribution, as ________ of 1986, could buy pensions of $2600 per month (instead of $900 per month) for UPS employees who retired from UPS service after twenty-five years. Alternatively, UPS, in a single-employer plan, could fund the $900 per month pension for employees retiring after 25 years with a contribution of less than 70 cents (rather than $1.66) for every employee hour worked. The UPS employees' brief explains what happened after they learned of the potential benefits of a single- employer plan: "In an effort to remedy their inequitable treatment within the Teamsters Fund, the UPS Participants repeatedly petitioned their union leaders to negotiate [through collective bargaining with UPS management] for a -9- 9 separate pension plan on their behalf" -- a plan, the record indicates, that the employees assumed would involve a transfer of some portion of Teamsters Pension Fund assets and liabilities to the new fund. "However," the employees add, "the UPS Participants' efforts to negotiate a separate UPS pension plan [were] thwarted by the provision in the Teamster Fund's governing documents which absolutely prohibits any transfer of assets . . . ." Brief for Plaintiffs-Appellants at 10. "Thwarted" in their efforts to take assets from the Teamsters Pension Fund, and thereby, in their view, "thwarted" in their efforts to bring about the creation of a new fund, the UPS employees filed suit against the trustees. They asked the court either (1) to order the trustees to create special benefit levels within the Teamsters Pension Fund for UPS participants (to reflect, in whole or in part, their favorable actuarial status), or (2) to loosen the prohibition on asset transfers, thereby, in their view, making it possible for them to negotiate a plan switch with UPS management. They argued that the trustees' failure to do one or the other violated various provisions of the Labor Management Relations Act (LMRA), 29 U.S.C. 141 et seq., __ ____ and of ERISA. As we have said, after a trial, the district -10- 10 court entered judgment for the trustees. The employees now appeal that judgment. The UPS employees have simplified their claims on appeal. They have abandoned their demand that the trustees create a special level of benefits within the Teamsters Pension Fund. They focus instead upon the trustees' rule- based refusal to permit any transfer of assets to a new UPS- only fund. The passage of time has also simplified this appeal. The Supreme Court has recently decided a case which we awaited before deciding this appeal, namely Local 144 __________ Nursing Home Pension Fund v. Demisay, 113 S. Ct. 2252 ________________________________________ (1993). Demisay involved LMRA- and ERISA-based challenges _______ to a refusal, by trustees of a multiemployer pension plan, to transfer assets to another plan. In its decision, the Court barred the LMRA-based claims on jurisdictional grounds, but it remanded (without deciding) the ERISA-based claims. As a result of that decision, the UPS employees concede that they "can no longer pursue a claim for relief under [the applicable section of] the LMRA." -11- 11 The UPS employees now pursue their remaining claim, namely that the trustees' rule-based refusal to transfer assets violates ERISA. -12- 12 II Standing ________ We begin with the trustees' assertion that the employees lack standing. They concede that the employees may bring an ERISA action if they have been "adversely affected by the act or omission of any party . . . with respect to a multiemployer plan." 29 U.S.C. 1451(a). They claim, however, that the employees have not been "adversely affected" by the asset transfer prohibition principally because, in the trustees' view, "UPS participants could receive the same level of [pension] benefits with or without a transfer of assets to a new _______ single-employer fund." Brief for Defendants-Appellees at 34 (emphasis added). Insofar as we understand this somewhat counter-intuitive argument, we cannot agree with it. In evaluating the argument, we have kept separately in mind two different groups of UPS employees. In the first group are those employees who, were a switch to occur, would not yet have any vested Teamsters Pension Fund ______ rights but who will keep working for several years after the switch (e.g., a UPS employee who worked, say, four years at the time of the switch, and continues to work for more than an additional year). Both sides agree that a new, UPS-only -13- 13 pension plan would need to give these employees (whom we shall call "not-yet-vested employees") full credit for their past years of Teamsters-Pension-Fund-related service (e.g., the plan would need to give the four-year employee fully vested, five-year, rights after one more additional year of work). Everyone also agrees, however, that the "no asset transfer" rule means that the new fund would be left without any assets to pay for these past service credits. The ___ employees' counsel estimates the "loss of the UPS Participants' unvested benefits" (which we take to mean the cost of these past service credits) at approximately $5 million. Brief for Plaintiffs-Appellants at 10 n.1. The trustees' figures, if anything, appear to place the figure higher. In the second group are those employees who, were a switch to occur, would already have vested rights (we _______ shall call them "already-vested employees"). Everyone agrees that a new, UPS-only fund would not have to pay ___ pensions reflecting the past years of service of these already-vested employees, for those pension rights would _____ remain the legal responsibility of the Teamsters Pension Fund. (In practice, the old fund pays supplemental pension benefits directly to the employee after retiring.) Since a -14- 14 new fund would not have to pay for these employees' past years of service, it would not need assets to help it make any such payments. And, thus, the new fund would be somewhat indifferent to the presence of the trustees' "no asset transfer" rule. The employees recognize this point, which is why they suggest they would ultimately ask only for the approximately $5 million -- or some portion thereof -- they claim it would cost to pay the past service credits of the not-yet-vested employees. ______________ With this distinction in mind, we have turned to the trustees' "no standing" argument. The argument depends upon a table (entitled "Transfer of Assets and Liabilities Vs. No Transfer -- Hancock Numbers") that seems designed to show that, if asset transfers were permissible, the following would occur: (1) the new fund would assume all pension liability for the already-vested employees; (2) it ______________ would obtain assets from the old fund to help pay that (already-vested employee) liability; but, (3) for reasons having to do with the inadequate funding of the Teamsters Pension Fund as a whole, these assets would fall far short of the amount needed to pay for the already-vested employees; (4) the asset shortfall (in respect to already- vested employees) would more than outweigh any benefit to -15- 15 the new fund through its obtaining a share of the (roughly) $5 million of assets in respect to the not-yet-vested ______________ employees' pensions; (5) the rules related to UPS' "withdrawal liability" (a complicated statutory requirement that employers who leave a multiemployer plan pay a fair share of the fund's overall deficit) would then somehow even things out, so that UPS would be neither better nor worse off with a transfer of assets than without one. The problem with the table is that we cannot understand the reasoning that underlies it. The trustees nowhere explain why a new fund could not request a transfer only of assets related to not-yet-vested benefits (and ____ simply not bother with a transfer of assets, and liabilities, related to vested benefits). And, so long as the employees limit their request in this, or some similar way, it seems plain to us that a rule blocking the transfer of any assets means a poorer fund. We assume, therefore, that the employees have standing, and we proceed on that basis. III Fiduciary Obligations Under ERISA _________________________________ The UPS employees' basic argument is that the trustees, in maintaining a "no asset transfer" rule, have violated the -16- 16 fiduciary obligations that ERISA imposes upon them. Those obligations are "strict." NLRB v. Amax Coal Co., 453 U.S. ____ ______________ 322, 332 (1981). The trustees must discharge their duties "with respect to a [multiemployer] plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and beneficiaries," and they must do so "with [] care, skill, prudence, and diligence." See ERISA, 29 U.S.C. ___ 1104(a)(1); see also id. 1106 (describing other fiduciary ___ ____ ___ duties of trustees). At the same time, where, as here, there is no claim of trustee self-dealing or the like, we do not simply substitute our judgment for that of the trustees. We review the trustees' decision at a distance. See Mahoney ___ _______ v. Board of Trustees, 973 F.2d 968, 970-73 (1st Cir. 1992) __________________ (refusing to apply close scrutiny to a pension fund trustee decision even where mild self-dealing was involved); cf. ___ Unocal Corp. v. Mesa Petroleum Co., 493 A.2d 946, 958 (Del. _____________ ___________________ 1985) ("[U]nless it is shown by a preponderance of the evidence that the [fiduciaries'] decisions were primarily based on perpetuating themselves in office, or some other breach of fiduciary duty such as fraud, overreaching, lack of good faith, or being uninformed, a Court will not substitute its judgment for that of the [fiduciaries]."). -17- 17 The decision to maintain a "no asset transfer" rule requires the trustees to balance obligations that run both to ____ employees who may wish to leave the fund and to those who ___ wish to stay. As is well-established, courts set aside this type of trustee management decision only if it is "arbitrary and capricious in light of the trustees' responsibility to all potential beneficiaries." Clearly v. Graphic _______ _______ Communications Int'l Union Supplemental Retirement and ____________________________________________________________ Disability Fund, 841 F.2d 444, 449 (1st Cir. 1988) (citing _______________ other First Circuit cases on point). We cannot say that the trustees' decision here is arbitrary. In reaching this conclusion, we have considered two possible arguments. The first (implicit in much of what the UPS employees say) is that the Teamsters Pension Fund has treated them unfairly while they have remained in the Fund by not giving them higher pension benefits than other employee groups with less favorable actuarial characteristics. On this view, the sole fact that they were earning (as of 1986) a $900 pension when they could have _____ been earning a $2600 pension had the Fund treated them as a separate actuarial group demonstrates this unfairness. And, arguably, this "unfair" treatment warrants some special transfer of assets should they leave the Fund. -18- 18 The problem with this argument is that the discrepancy between $900 and $2600 does not, by itself, ___ indicate that the Teamsters Pension Fund treated the employees unfairly (and nor have the employees offered any other evidence of unfair treatment while in the Fund). As discussed above, see supra pp. 6-7, multiemployer, defined- ___ _____ benefit pension funds provide their participants a whole cluster of benefits, most notably, a guaranteed decent pension for all longtime workers. And as also discussed above, such funds do this largely by collecting "excess" contributions in respect to certain kinds of employees such as temporary workers (whose benefits never vest), young workers, and super- longterm employees, and by sharing these excess contributions with all the employees in the fund, not just ___ with the employees of employers who paid the excess. Accordingly, a basic objective of these funds would be undermined if every employee group (such as UPS) with a disproportionate share of excess contributions (and there may be many others) wanted special pension levels to reflect that fact. It is thus no coincidence that, according to the findings of the district court, no other regional Teamster pension fund provides special benefits for actuarially -19- 19 favorable employee groups, and only one non-Teamster fund in the entire country does so. In short, UPS and its employees could have quit the Teamsters Pension Fund at any time, but so long as they stayed -- and enjoyed the guaranteed, mobile pension benefits the Fund provides -- there seems nothing obviously unfair in denying them special (e.g., $2600) benefits. The UPS employees, by abandoning on appeal their demand for such benefits, seem, in effect, to concede the point. (We add that, on appeal, the UPS employees also seem to suggest that a new fund would not be entitled to an amount of assets anywhere near as large as the amount that would reflect the UPS employees' "excess" contribution.) The second basic argument that the trustees have acted arbitrarily focuses on the "no transfer" rule. The employees argue that if they quit the Teamsters Pension Fund (because they no longer, in the future, want to share their excess contributions), the rule would prevent them, as explained in the standing section, supra Part II, from _____ getting any assets to help pay for the past service credits ___ of the not-yet-vested employees. And, it would prevent the new fund from getting such assets even though UPS has dutifully made contributions into the old fund on behalf of -20- 20 these same employees. This, they say, is unfair. The UPS employees concede, again as mentioned in the standing section, that the "no transfer rule" is a wash with respect to already-vested employees and, to that extent, the rule is ______________ not unfair. They also recognize that, as long as the ___ Teamsters Pension Fund has liabilities in excess of its assets, they might not be entitled to get funds to cover all ___ of the past service credits of not-yet-vested employees; yet they say they are entitled to funds to cover at least some. ____ Can the trustees' decision not to transfer even one dime of the Fund's assets attributable to not-yet-vested pension rights (keeping those assets for the benefit of other non-UPS participants) be considered reasonable? Although we find the question a difficult one, we believe the answer is "yes" -- at least in the absence of some special circumstance that the record here does not reveal. In arriving at this conclusion, we fully recognize that the trustees' blanket refusal operates in practice like a penalty for withdrawing from the Fund -- a penalty somewhat similar to the penalties bank customers pay for early withdrawals from CDs and the like, but a penalty nonetheless. Whether such a penalty is reasonable depends, -21- 21 in our view, upon whether it serves a legitimate deterrent purpose, upon whether the participants in the fund know about it in advance, and upon its size in relation to its function. The penalty's deterrent function here is legitimate. Multiemployer, defined-benefit pension plans almost inevitably produce some actuarially-favored, and some actuarially-disfavored, groups. Such plans have a strong interest in discouraging actuarially-favored employee groups from withdrawing. For the employees left behind, withdrawal means, among other things, a smaller fund, consequently greater investment costs and risks, and fewer employers for whom those employees can work without losing their accrued years of service. Those left behind, moreover, also lose the benefit of sharing the departing employer's "excess" contributions, say, those related to temporary employees. Some departing employees, we should remind them, would be in the same situation had personal circumstances earlier led them to switch to actuarially-disfavored employers. Also, departing employees, up until the time of departure, have enjoyed the benefits of the large fund that departure disincentives have helped to maintain. -22- 22 Moving to the next inquiry, we think that employees leaving the Fund might reasonably expect to incur some such departure penalty (not to be confused, by the way, with "withdrawal liability," mentioned supra pp. 14-15). _____ The governing document of the Teamsters Pension Fund has contained the "no asset transfer" clause since the Fund's creation. More importantly, the penalty concerns the loss of a special kind of asset, namely the loss of assets related to not-yet-vested contributions. And, participants in many pension funds normally lose such assets entirely when they leave fund-covered employment prior to vesting. Departing employees leave Teamsters Pension Fund-covered employment whether they quit the industry or whether, by switching plans, they and their employer leave the Teamster Pension Fund. Of course, the two activities -- quitting a job and switching plans -- are not the same. But, they are closely enough related to make the penalty of an unsurprising kind (and, of course, from the point of view of the remaining participants, the effect of departure is the same). It also seems to us that the size of the withdrawal penalty is relatively modest. The record suggests that the employees can take advantage of their -23- 23 actuarially favorable position by leaving the Teamster Fund even without an asset transfer, albeit not quite to the same ______________________________ degree. In absolute terms, we have already mentioned that the employees appear to value the not-yet-vested employee liability at roughly $5 million; we have also already mentioned that the employees recognize that they would be entitled, the Teamsters Pension Fund being in debt, to an amount of assets to cover only some, not all, of this ____ liability -- i.e., an amount less than $5 million, perhaps much less. (Our own crude calculations, based on figures from the trustees' table, puts the amount at $3.7 million.) Whatever the exact figure, it is a fairly small amount compared to other amounts such as UPS' annual contributions ($18 million dollars as of 1986, according to the employees' actuaries) or the "withdrawal liability" UPS would likely have to pay upon departure (in the tens of millions of dollars, again as of 1986). Finally, if the "no asset transfer" rule costs the new fund too much, there is a safety valve. The employees can automatically entitle themselves to a share of fund assets should the matter become so critically important to them that they take the drastic step of changing collective -24- 24 bargaining representatives (i.e., of leaving the Teamsters). See ERISA, 29 U.S.C 1415(a). ___ Ultimately, the weighing of the conflicting interests here at issue -- those of departing employees in obtaining the nonvested share of assets versus those of most fund participants in discouraging departures -- is up to the trustees (who reflect the interests both of employers and the employees, through their collective bargaining representatives). The question is close enough so that, in our view, the ultimate weighing is not up to the courts. The treatment of the departing employees (that they must forfeit unvested rights) is not so unfair as to make the rule arbitrary. We do not say that any rule that blocks ___ asset transfers is reasonable, nor that the present "no transfer" rule is reasonable in all circumstances. We ___ simply say that the record before us does not demonstrate that it is arbitrary as applied to the circumstances before us. Thus, we do not find a violation of the basic fiduciary obligations that ERISA imposes upon trustees. IV ERISA Section 4234(a) _____________________ -25- 25 The UPS employees also claim that the "no asset transfer" rule violates ERISA section 4234(a), which says, in relevant part, that [a] transfer of assets from a multiemployer plan to another plan shall comply with asset-transfer rules which shall be adopted by the multiemployer plan and which . . . do not unreasonably restrict the transfer of plan assets in connection with the transfer of plan liabilities. 29 U.S.C. 1414(a). They argue (1) that the provision is applicable to the instant case, (2) that the trustees have failed to "adopt[]" any "asset-transfer rules," and (3) that any such rules they might have adopted are "unreasonably restrict[ive]." The trustees do not agree that the provision applies to this case. Specifically, they argue that it applies only where a fund's trustees intend to transfer some of its liabilities -- not the situation here -- and the question is whether, or to what extent, the trustees must allow assets to accompany the transferred liabilities. This is the interpretation of the statute that the Third Circuit has endorsed, and with which, for the reasons stated in that opinion, we agree. See Vornado, Inc. v. Trustees of The ___ _____________ ________________ Retail Store Employees' Union Local 1262, 829 F.2d 416 (3d _________________________________________ Cir. 1987). -26- 26 Even assuming that the provision applies, however, we cannot accept the employees' claim that the trustees have failed to "adopt[]" any "asset-transfer rules." The "no asset transfer" is itself a rule about asset transfers. ______ Moreover, that rule is not quite as absolute as it sounds, for the trustees acknowledge that, if ERISA's fiduciary duty rules require them to transfer assets, the rule permits them to comply. The Trust Agreement itself, in Article XII, section 10, says that they must do so. See supra p. 8. ___ _____ Further, the asset transfer prohibition, as so interpreted, is not "unreasonably restrict[ive]," for the very reasons we have set forth in Part III, supra. _____ For the reasons stated, the judgment of the district court is Affirmed. Affirmed ________ -27- 27