GANTON TECHNOLOGIES, INC., and Shirley Klamm, Ronald Brown, and Craig Small, as employees of Ganton Technologies, Inc., Plaintiffs,

v.

NATIONAL INDUSTRIAL GROUP PENSION PLAN, a Multi-employer Trust Fund, Stanley L. Eisner, Ronald W. Borst, Michael Kelly, A.E. Samson, Richard Shirley, Milford E. Woodbeck, Elmer Chatak, Dominick D'Ambrosio, Edgar Ball, Odessa Komer, and Harvey Martin, as Trustees of the National Industrial Group Pension Plan, Defendants.

No. 93 Civ. 3047 (LLS).

United States District Court, S.D. New York.

Oct. 19, 1994.

Wildman, Harrold, Allen, Dixon & Smith, New York City (H. Roderic Heard, Matthew A. Hurd, Kimberly E. Roy, Thomas J. Smith, of counsel), for plaintiffs.

Epstein Becker & Green, P.C., New York City (Philip M. Berkowitz, Linda E. Rosenzweig, Erica L. Summers, of counsel), for defendants.

### Opinion and Order

STANTON, District Judge.

Plaintiffs Ganton Technologies, Inc. ("Ganton") and three Ganton employees brought this action claiming that defendants National Industrial Group Pension Plan ("NIGPP"), a multiemployer defined-benefit pension plan, and its trustees violated the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461, and section 302(c)(5) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186(c)(5), by refusing to transfer to a new single-employer pension plan that portion of NIGPP's assets attributable to Ganton's contributions. (Compl. ¶¶ 31–44.) Plaintiffs requested a declaratory judgment that NIGPP's refusal was

unlawful and an order directing NIGPP to transfer the assets in question to the Ganton Technologies Inc. Racine Hourly Employees Retirement Plan (the "Ganton Plan"). (Compl. at 10, 14.)

Defendants counterclaimed and sought an order requiring Ganton to cooperate with NIGPP's efforts to determine the extent of Ganton's liability for delinquent contributions. (Answer, ¶¶ 56–61.) Plaintiffs now move for summary judgment on their ERISA claims;[1] defendants move for summary judgment dismissing plaintiffs' ERISA claims and granting the counterclaim.

### BACKGROUND

#### A. *Ganton's Participation in NIGPP*

From 1967 to 1992, Ganton and its predecessor in interest, Racine Die Cast Company ("Racine") contributed to NIGPP on behalf of their employees pursuant to collective bargaining agreements with United Automobile Workers Local 627. (Compl. ¶ 9.) Racine entered into a participation agreement dated August 14, 1967 (the "Participation Agreement") by which Racine agreed to be bound by the NIGPP Agreement and Declaration of Trust (the "Plan") and to contribute to NIGPP. (First Pante Aff., Exh. B.)

The Plan grants to NIGPP's Board of Trustees (the "Board") broad powers to administer the Plan and construe its terms. Article VIII, section 8.03 of the Plan contains its provisions concerning transfer of assets to another plan. (Compl.Exh. A.)

In the early 1980s, NIGPP granted a number of transfers pursuant to section 8.03. (First Pante Aff. ¶ 4.) At a meeting in December 1984, the Plan's manager and actuary informed the Board that if it continued to approve such transfers, NIGPP could become underfunded. As a result, the Board suspended all such transfers pending further review, a decision it reaffirmed at each subsequent meeting through February 1986. At that time, the Board suspended all asset transfers indefinitely. (*Id.* ¶ 5.)

---

1. Plaintiffs withdrew their LMRA claim pursuant to Fed.R.Civ.P. 41(a)(1)(i) by a Notice of Dismiss-

al filed August 6, 1993.

Sometime before early 1992, Ganton began to question the wisdom of continued participation in NIGPP. Ganton believed that as a result of the changed demographics of its workforce its contributions far exceeded its employees' accrued benefits and thought it could provide the same benefits to its workers by contributing a lower amount to its own plan. (*See* Letter from Odessa Komer to Elmer Chatak and Ronald Borst dated February 14, 1992, Kutchin Aff., Exh. B.) Ganton made its last contribution to NIGPP on January 26, 1992. (Defendants' Statement Pursuant to Local Civil Rule 3(g), ¶ 6.) [2]

### B. *Ganton's Attempts to Obtain Resets and an Asset Transfer*

Ganton and the UAW entered into a new collective bargaining agreement dated February 22, 1992 (Compl.Exh. B), which contemplated the establishment of the Ganton Plan. The agreement required Ganton to contribute to an escrow account instead of to NIGPP and to establish an "NIGPP mirror plan." (*Id.*, Art. 14, ¶¶ 2–3.) It also provided that Ganton and the UAW would explore alternatives (specifically a benefit adjustment, or "reset") which would allow Ganton to remain in NIGPP. (*Id.* ¶ 1.) The parties agreed that the UAW would not take a position on any effort by Ganton to "recover the excess funding" from NIGPP. (*Id.* ¶ 5.)

During the spring of 1992, Ganton tried to persuade NIGPP to reset Ganton's benefit and contribution levels. Michael Kutchin, Vice President and Chief Financial Officer, requested that NIGPP decrease Ganton's contribution rate and increase the benefit level for Ganton's employees. (Letter from Michael Kutchin to NIGPP dated March 30, 1992, Kutchin Aff., Exh. D.) NIGPP denied the request, but informed Ganton that it was considering increasing the benefits paid to all plan participants. (Letter from Dennis Pante to Mike Kutchin dated April 13, 1992, First Pante Aff., Exh. C.)

Pante also warned Kutchin that NIGPP did not permit participating employers to withhold contributions and would take appropriate action to collect delinquent contributions. (*Id.*) After Ganton failed to make several additional contributions, NIGPP terminated the Participation Agreement as of January 26, 1992, the date of the last payment, and requested a listing of hours worked by NIGPP participants between January 26 and June 1, 1992. (Letter from NIGPP Administrative Agency to Ganton dated June 1, 1992, First Pante Aff., Exh. D.)

Having failed to achieve a reset of its contribution or benefit levels, Ganton requested NIGPP to transfer Ganton's share of assets and liabilities to the Ganton Plan. (Letter from Michael Kutchin to Dennis Pante dated June 29, 1992, Compl.Exh. F.) At meetings held on June 29 and 30, 1992, the Board heard a review of the history of the asset transfer moratorium and a presentation by NIGPP's actuary, John Slowata, of the potential adverse effects of allowing asset transfers. The Board reaffirmed its no-transfer policy and denied Ganton's request, stating that "such transfers are not in the best interest of the Plan or its participants." (Letter from Dennis Pante to Michael Kutchin dated July 7, 1992, Compl.Exh. G.)

### C. *The Ganton Plan*

The Ganton Plan was established in the spring of 1993. The pension agreement between Ganton and the UAW (the "Ganton Plan Agreement") provides that Ganton will assume liability for service credits earned by Ganton Plan participants prior to January 26, 1992 if NIGPP transfers to the Ganton Plan the assets and liabilities relating to the Ganton participants. (Compl.Exh. D, Art. II, section 2.1.) If NIGPP does not transfer those assets and liabilities, the Ganton Plan is liable to pay benefits earned after January 26, 1992 under the Ganton Plan plus an amount representing the difference between

---

**2.** Plaintiffs dispute defendants' assertion that Ganton did not contribute to NIGPP after January 26, 1992. (*See* Plaintiffs' Response to Defendants' 3(g) Statement, ¶ 6.) The Complaint, however, alleges that "effective January 26, 1992, Ganton began making contributions at the agreed contribution rate to an escrow account,"

(Compl. ¶ 16), and plaintiffs state that "[n]o contributions were made for periods after" January 26, 1992. (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, at 58) (hereinafter "Plaintiffs' Opposition Brief".)

the NIGPP and Ganton Plan benefit levels. (*Id.*) Absent a transfer, NIGPP will pay the Ganton participants the full amount of their accrued benefits, regardless of whether their right to those benefits had vested as of Ganton's termination date. (First Slowata Aff. ¶ 12.)

### D. *The NIGPP Benefit Increase*

In April 1993 the Board notified participating employer and union representatives that the Plan had more assets than liabilities for accrued vested benefits. (Memorandum from NIGPP Board to Participating Employer and Union Representatives dated April 1993, Compl.Exh. I., at 1.) As a result, the Board amended the Plan to provide that no withdrawal liability would be imposed on employers withdrawing in a year immediately following a year in which the Plan was fully funded. (*Id.* at 2.) The Board also voted to increase benefit levels, effective January 1, 1993, for all employers who had not terminated as of that date. (*Id.* at 1; First Slowata Aff. ¶ 8.)

### DISCUSSION

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if there is sufficient evidence from which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A material factual dispute is one which affects the outcome of the suit. *Id.*

There are no material factual disputes.

### A. *Fiduciary Duty Claims*

Plaintiffs claim that defendant trustees breached their fiduciary duties under section 404 of ERISA[3] by the manner in which they interpreted and applied section 8.03 of the Plan. Defendants argue that plaintiffs lack standing to sue for breach of fiduciary duty, (Defendants' Memorandum in Support of Their Motion for Summary Judgment, at 26–30) (hereinafter "Defendants' Principal Brief") and that the trustees acted in the best interest of the Plan and its participants in suspending transfers and denying Ganton's request. (*Id.* at 23–26.)

### 1. Standard of Review

■ When the plan documents give a fiduciary discretion to construe plan terms, court review is limited to determining whether the fiduciary's interpretation and application of plan terms is arbitrary and capricious. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989). Article IX, section 9.01 of the Plan allows the Board to "make such rules and prescribe such procedures for the administration of the Plan as it deems necessary and reasonable." That section also provides, "The Board shall have the power to resolve all disputes and ambiguities relating to the interpretation of the Plan, and the application of the terms of the Plan to any circumstances and the decisions of the Board in all such matters shall be final." (Plan, Compl. Exh. A.) The trustees, deciding whether to promulgate and adhere to a no-transfer rule and to apply that rule to Ganton's request, had to weigh the competing interests of the fund, departing participants and remaining participants. Thus, the "arbitrary and capricious" standard is appropriate. *See Caterino v. Barry*, 8 F.3d 878, 883 (1st Cir.1993) (applying "arbitrary and capricious" standard of review to trustees' decision to maintain rule prohibiting asset transfers).

---

**3.** Section 404 requires that a fiduciary "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of providing benefits to participants and their beneficiaries ... and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the

provisions of this subchapter and subchapter III of this chapter." 29 U.S.C. § 1104(a). Section 409 provides that a fiduciary who breaches his fiduciary duties shall be liable to the plan for any plan losses and personal profit, and shall be subject to other equitable or remedial relief. 29 U.S.C. § 1109(a).

### 2. Merits of Fiduciary Duty Claims

Plaintiffs' claims for breach of fiduciary duty can be divided into plan violations and ERISA violations. Plaintiffs argue that the trustees interpreted and applied section 8.03 in a manner inconsistent with its language. That conduct, they urge, violates section 404(a)(1)(D) of ERISA, which requires plan fiduciaries to administer plans in accordance with the plan documents. Plaintiffs also contend that the trustees' formulation and maintenance of a no-transfer policy and its denial of Ganton's request violated section 404(a)(1)'s requirement that fiduciaries administer the plan "solely in the interest of the participants and beneficiaries."

#### a. Violation of the Plan

■ Section 8.03 of the Plan provides:
In lieu of the procedures described in sections 8.02, 8.04, 8.05 and 8.06, the Board may, subsequent to the termination of a Participation Agreement, if so requested by the Participating Employer and Union, approve the transfer to another qualified plan of:
(1) the obligation to provide pensions, and
(2) a portion of the Plan Assets (subject to adjustment, as determined by the Board, to reflect market value fluctuations) equal to the net amount determined under subsection 8.04(a), minus any pension payments made after the termination date, if that action is deemed by the Board to be in the best interests of the Plan and if said transfer is consistent with the rules of the Board and the requirements of applicable Federal law.

Plaintiffs say section 8.03 requires individual analysis of each asset transfer request, which, because of the blanket no-transfer policy, the Board failed to give to Ganton's transfer request. (Plaintiffs' Opposition Brief, at 26, 29–31.)

Nothing in section 8.03 requires the Board, in deciding whether to grant an asset-transfer request, to engage in any particular analysis. Section 8.03, read with section 9.01,[4] permits the Board to make and apply rules regarding asset transfers. It does not re-

quire, but says the Board "may," grant those transfers requested by the employer and union which comply with the Board's rules and are in the best interests of the Plan. As long as the Board periodically re-evaluated the policy to assure its reasonableness as conditions changed, the Board did not, in light of the advice from its actuaries, act arbitrarily or capriciously in adopting a no-transfer rule on the grounds that transfers are not in the best interest of the Plan.

■ Nor did the trustees abuse their discretion in not giving participants and employers notice of the policy. Because section 8.03 states that proposed asset transfers are subject to the Board's rules as well as the terms of the Plan, plaintiffs were on notice that an employer requesting an asset transfer might have to comply with additional requirements not set forth in the Plan document. Plaintiffs could not have reasonably expected their portion of assets and liabilities to be readily portable without approval pursuant to section 8.03 since Article III, section 3.04 of the Plan provides, "Neither the Unions, Participating Employers, Participants, nor any other person, association, or corporation shall have any right, title or interest in or to the Trust Fund."

Even reading section 8.03 to require individual consideration of asset-transfer requests, the Board made a reasonable evaluation of Ganton's request. It heard the opinions of the Plan's actuary and revisited the no-transfer rule in light of Ganton's request. On rational grounds, it determined that granting the request was not in the best interest of the Plan. Section 8.03 requires no more.

#### b. "Solely in the interest of the participants"

Plaintiffs describe the Board's refusal to transfer Ganton's alleged surplus as allowing the Plan to increase benefits to non-Ganton participants, in violation of ERISA section 404's requirement that a plan be administered "solely and exclusively in the interest of participants and beneficiaries." (Plaintiffs'

---

**4.** Section 9.01 of the Plan states, in relevant part: "The Board shall make such rules and prescribe such procedures for the administration of the Plan as it deems necessary and reasonable."

Brief in Support of Their Motion for Summary Judgment, at 11.) They complain that although Ganton would have been required to pay a share of the Plan's unfunded vested benefits if the Plan had been operating at a deficit, Ganton is not permitted to share in the Plan's or Ganton's own surplus on termination.

However, that is the way multiemployer plans operate.

■ Employer contributions to multiemployer plans are established in collective bargaining agreements negotiated between participating employers and unions. *See Caterino v. Barry,* 761 F.Supp. 897, 899–900 (D.Mass.1991), *aff'd,* 8 F.3d 878 (1st Cir. 1993); First Slowata Aff. ¶ 4. Benefits are established by the plan on the basis of the entire fund's actuarial characteristics. (*See* First Slowata Aff. ¶ 7.) Contributions are pooled and used to pay the plan's benefit obligations without reference to the source of the contribution. *Concrete Pipe & Prod. v. Construction Laborers Pension Trust,* —— U.S. ——, 113 S.Ct. 2264, 2271, 124 L.Ed.2d 539 (1993). A defined-benefit multiemployer plan like NIGPP "does *not* guarantee any employee that he will receive a pension that *exactly* reflects all the contributions made on behalf of *that particular employee* over the years." *Caterino,* 8 F.3d at 879 (emphases in original). Instead, any "excess" contributions are used "to assure that *all* workers . . . will have a decent pension." *Id.* at 880 (emphasis in original). The pooling allows employees to switch employers without sacrificing unvested accrued benefits, *id.,* and "insulates participant employers and their employees from the detrimental effects of changes in the economy." *Caterino,* 761 F.Supp. at 901.

■ For an employer, participating in a multiemployer plan is thus equivalent to betting on the actuarial characteristics of one's employees. An employer "hopes that its employees will vest at a rate above the average for all employees of contributing employers . . . [but] also appreciates the risk that circumstances will produce the opposite result." *Concrete Pipe,* —— U.S. at ——, 113 S.Ct. at 2288. Ganton believed it lost: its employees, because they were young, accrued benefits at

a lower rate than those of other participating employees. (Plaintiffs' Opposition Brief, at 3.) Any excess, however, belongs to the Plan, not to Ganton.

■ The Board was required to balance the Ganton participants' interests against those of the remaining participants with the ultimate objective of preserving the fund and providing benefits for as many participants as possible. Courts consistently uphold trustees' decisions when they are rationally related to preservation of the plan. *See, e.g., Morse v. Stanley,* 732 F.2d 1139, 1146 (2nd Cir.1984) (trustees' refusal to grant accelerated benefits to employees leaving to work for competitor "must be characterized as an effort to preserve the trust corpus" and be upheld). When a fiduciary acts on the advice of a plan's actuary, the decision will be sustained unless it was unreasonable even if it favors one group of employees over another. *See Oster v. Barco of California Employees' Retirement Plan,* 869 F.2d 1215, 1220 (9th Cir.1988).

According to the Plan's actuary, John Slowata, permitting asset transfers like the one Ganton requested would have a disastrous effect on the Plan. He told the trustees that "transfers of assets are likely to be selectively requested only by employers who have an excess of contributions over the present value of vested benefits of their employees." (First Slowata Aff. ¶ 11.) He drew the Board's attention to the Plan's declining contribution base, and the prospect that asset transfers could lead to unfunded vested benefits. (*Id.*)

Plaintiffs and Paul Polchert, the Ganton Plan's actuary, challenged defendants' fears regarding the long-term effects of allowing asset transfers in general and Ganton's transfer in particular, and argued that the Plan could protect itself by assessing withdrawal liability. (Plaintiffs' Opposition Brief, at 33–34.) Defendants' expert disputed that withdrawal liability can adequately protect a plan. (McGinn Aff. ¶ 9.)

Plaintiffs have not shown that defendants' approach was unreasonable. Daniel McGinn, an actuary specializing in multiemployer

plans, supports the long-term view adopted by NIGPP:

> The funding of defined benefit pension plans occurs over many years, and the benefit payments attributable to plan members stretch-out over a period of at least 50 to 70 years. Making actuarial calculations or determinations based on a "snapshot" valuation of liabilities is very limited in value. In my experience as an actuary to multiemployer funds, the trustees of such funds have to consider possible long-term changes in the actuarial experience of the total covered population of employees and employers in deciding whether to permit transfers of assets and liabilities. For instance, in addition to continuing mortality improvements, during recessionary periods, there can be a substantial increase in early retirements due to job losses.... The trustees must consider not only the impact of a single transfer, but also the long-term effect of having a policy that would allow continuing transfers of assets. (*Id.* ¶ 5.)

Taking a reasonable long-term approach, the trustees did not abuse their discretion in denying Ganton's request for an asset transfer.

## B. *Section 4234 Claims*

■ Plaintiffs claim that NIGPP's asset-transfer rule [5] violates section 4234(a) of ERISA, 29 U.S.C. § 1414(a), which provides:

> A transfer of assets from a multi-employer plan to another plan shall comply with asset-transfer rules which shall be adopted by the multiemployer plan and which—
>
> (1) do not unreasonably restrict the transfer of plan assets in connection with the transfer of plan liabilities, and
>
> (2) operate and are applied uniformly with respect to each proposed transfer, except that the rules may provide for reasonable variations taking into account the potential financial impact of a proposed transfer on the multiemployer plan.

Relying on the section's requirement that asset-transfer rules be "applied uniformly," plaintiffs argue ERISA requires a balancing of the interests of departing and remaining participants. (Plaintiffs' Opposition Brief, at 22.) Thus, plaintiffs assert, section 8.03's "best interests of the Plan" standard violates ERISA. They argue that section 4234 requires a transfer of assets absent extraordinary circumstances (*Id.* at 18) or special circumstances. (*Id.* at 11.) They contend that a multiemployer plan must adopt asset-transfer rules that are not "unreasonably restrictive in light of the plan's financial status." (*Id.* at 22.)

The language and legislative history does not support the contention that section 4234 requires a plan to transfer assets. Only one provision of the MPPAA requires a transfer of assets: section 4235 provides that in the event employees change collective bargaining representative, the "old plan shall transfer assets and liabilities to the new plan." 29 U.S.C. § 1415(a). The absence of such mandatory language in section 4234 undermines plaintiffs' construction.

Plaintiffs' interpretation also conflicts with Congress' purpose in enacting the MPPAA. By creating a presumption favoring asset transfers, plaintiffs' proposed standard would empower employers at the expense of trustees. The MPPAA, in contrast, "emphasized the interests of plan beneficiaries and the Pension Benefit Guaranty Corporation and was not designed to increase the power of contributing employers." *Demisay v. Local 144, Nursing Home Pension Fund,* 710 F.Supp. 58, 67 (S.D.N.Y.1989), *rev'd on other grounds,* 935 F.2d 528 (2nd Cir.1991), *rev'd,* —— U.S. ——, 113 S.Ct. 2252, 124 L.Ed.2d 522 (1993); *see also Vornado, Inc. v. Retail Store Employees' Union Local 1262,* 829 F.2d 416, 420 (3rd Cir.1987) (a "shift in initiative from trustee to employer is inconsistent with the thrust of [the MPPAA]").

Section 4234 does not require that a plan adopt any particular kind of asset-transfer rule; rather, it mandates that if a plan voluntarily transfers liabilities to another plan, the

---

5. To the extent plaintiffs' claims brought under section 4234 focus on defendant trustees' interpretation or application of section 8.03 of the Plan, they allege a breach of fiduciary duty and are discussed in part A, above.

transferor plan must uniformly apply asset-transfer rules which do not unreasonably restrict the transfer of assets along with the liabilities. *See Demisay,* 710 F.Supp. at 66 ("there is no indication in the statute or its legislative history that Congress intended to require a transfer of assets in any other situation [than a change in collective bargaining representative] unless there was a voluntary transfer of liabilities") (citing Views and Analysis of Senate Labor Committee on S. 1076, Benefits and Pension Reporter No. 288 (Apr. 26, 1980)).

In *Caterino v. Barry,* 8 F.3d 878, 881 (1st Cir.1993), the plaintiffs, participants in a multiemployer plan who wished to leave and establish a single-employer plan, claimed that a provision in the multiemployer plan prohibiting asset transfers violated section 4234. The court rejected this argument, reasoning that "if ERISA's fiduciary duties require [the trustees] to transfer assets, the rule permits them to comply." *Id.* at 885. The court also held that the prohibition was not unreasonably restrictive in light of its legitimate deterrent purposes, relatively modest size, and the notice provided to participants and employers. *Id.* at 884–85. That reasoning applies with greater force here, since the Plan does not prohibit all asset transfers but vests the trustees with discretion, which must be exercised in a manner consistent with their fiduciary obligations, to approve or deny requests.

The "best interests of the Plan" standard established by section 8.03 does not violate section 4234 of ERISA. Plaintiffs do not show that this standard precludes the Board from weighing the interests of participants and beneficiaries; indeed, the record of the Board's deliberations and its letter to Ganton denying the request demonstrate that the Board construed "the Plan" to encompass both the fund itself and the Plan's participants. (Minutes of Board Meeting held June 29 and 30, 1992, First Slowata Aff., Exh. A.) Plaintiffs' argument that ERISA requires a rule balancing only the interests of departing and remaining participants ignores the well-established rule that a trustee has a duty to preserve the trust corpus. *See Oster,* 869 F.2d at 1218 (fiduciaries "have a duty to keep the fund financially stable"); *Morse,* 732 F.2d at 1145. A trustee must balance all these interests, "doing his best for the entire trust looked at as a whole." *Oster,* 869 F.2d at 1218.

### C. *Standing*

Since defendants prevail on the merits, it is not necessary to address their arguments that plaintiffs lack standing to sue under sections 4234 and 404 of ERISA.

### D. *Defendants' Counterclaim*

▮ Section 515 of ERISA provides that "Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall ... make such contributions in accordance with the terms and conditions of such plan or agreement." 29 U.S.C. § 1145. Defendants seek an order allowing NIGPP to audit Ganton's records to ascertain the amount of unpaid contributions recoverable in an action under section 515.

Plaintiffs argue that Ganton was not "obligated to make contributions" to NIGPP after January 26, 1992, the date on which the collective bargaining agreement between Ganton and the UAW expired. (Plaintiffs' Opposition Brief, at 55–58.) They point to the Plan's definition of "participating employer" as one who has signed a participation agreement and is making contributions or is obligated to make contributions under a collective bargaining agreement. (*See* Compl. Exh. A, Art. X, section 10.03.) Defendants contend that Ganton's obligation to contribute did not cease until "June 1, 1992, the date Ganton's participation in the NIGPP terminated." (Defendants' Principal Brief, at 41.)

Defendants assert that NIGPP terminated Ganton's participation agreement pursuant to Article VIII, section 8.01(2) of the Plan. (*Id.* at 3.) Section 8.01 provides that "a Participation Agreement shall terminate on ... the date specified in a notice from the Board to the Participating Employer and Union, which the Board has determined to be the date of such termination, on account of the failure of the Participating Employer to pay Contributions or otherwise comply with the provisions

of the Plan." The letter from NIGPP terminating Ganton's Participation Agreement states that Ganton's "participation agreement has been terminated as of the date shown in the first paragraph." (Compl.Exh. E.) The only date appearing in the first paragraph is January 26, 1992, the date of Ganton's last payment. (*Id.*)

In the same letter, NIGPP also requested a listing of the hours worked by Ganton's employees between January 26 and June 1, 1992, implying that those employees continued to earn credit for work performed during that period. Under Article III, section 3.04 of the Plan, an employee earns service credits for hours worked for which he is paid or entitled to be paid by a participating employer, and for hours for which back pay is awarded. According to the terms of the Plan and NIGPP's termination notice, Ganton's employees did not earn any service credit for hours worked after January 26, 1992, when Ganton's Participation Agreement terminated. Thus, NIGPP is not entitled to the requested audit and defendants' motion for summary judgment on their counterclaim is denied.

## CONCLUSION

Defendants' motion for summary judgment dismissing plaintiffs' ERISA claims is granted; plaintiffs' motion is denied. Defendants' motion for summary judgment granting their counterclaim is denied.

The Clerk is directed to dismiss the complaint together with costs and disbursements to defendants as provided by law.

So ordered.